Docket Nos. 81890, 81891, 81892, 81893 cons.--Agenda

                        18--May 1997.

           VERNON BEST, Appellee, v. TAYLOR MACHINE WORKS

           et al., Appellants.--JONATHAN ISBELL, Administrator of

           the Estate of Steven A. Kelso, Appellee, v. UNION PACIFIC

             RAILROAD COMPANY et al., Appellants.

               Opinion filed December 18, 1997.

                                   JUSTICE McMORROW delivered the opinion of the court:

             This consolidated appeal arises from two personal injury

           tort actions filed in the circuit court of Madison County, in

           which the plaintiffs sought declaratory and injunctive relief

           against enforcement of "An Act to amend certain Acts in

           relation to civil actions, *** the Civil Justice Reform

           Amendments of 1995." Pub. Act 89--7, eff. March 9, 1995

           (hereafter Public Act 89--7 or the Act). In both cases, plaintiffs

           sought partial summary judgment on the grounds that the Act

           violated the Illinois Constitution of 1970. The circuit court of

           Madison County held the following provisions of Public Act 89-

           -7 unconstitutional: (1) the $500,000 limit on compensatory

           damages for noneconomic injuries (735 ILCS 5/2--1115.1 (West

           1996)), (2) the allocation of fault and several liability provisions

           (735 ILCS 5/2--1116, 2--1117 (West 1996)), (3) the

           amendments to the Joint Tortfeasor Contribution Act (740 ILCS

           100/3.5, 5 (West 1996)), (4) certain jury instructions (735 ILCS

           5/2--1107.1 (West 1996)), (5) the product liability certificate of

           merit (735 ILCS 5/2--623 (West 1996)), (6) the product liability

           statute of repose (735 ILCS 5/13--213(b) (West 1996)), (7) the

           product liability presumptions (735 ILCS 5/2--2103, 2--2104, 2--

           2106 (West 1996)) and (8) the discovery statutes which require

           mandatory disclosure of all of plaintiffs' medical information

           and records (735 ILCS 5/2--1003, 8--802, 8--2001, 8--2003

           (West 1996)). The court also held that Public Act 89--7 is

           unconstitutional as a whole.

             Defendants timely appealed the circuit court's order to this

           court, and we consolidated the cases. We allowed the Attorney

           General, James E. Ryan, to intervene to defend the

           constitutionality of Public Act 89--7.

             We also granted the following organizations leave to submit

           briefs amicus curiae: (1) Illinois Hospital & Healthsystems

           Association and the Metropolitan Chicago Healthcare Council,

           (2) Illinois State Medical Society, (3) Product Liability Advisory

           Council, Inc., (4) Illinois Manufacturers' Association, (5) Illinois

           Association of Defense Trial Counsel, (6) Illinois Civil Justice

           League, (7) Illinois State Federation of Labor and Congress of

           Industrial Organization and Ironworker's District Council of

           Greater Chicago, (8) Illinois State Council of Senior Citizens,

           Families Advocating Injury Reduction (FAIR), Union of

           Needletrades, Industrial and Textile Employees (UNITE),

           Coalition for Consumer Rights, Citizen Action/Illinois Chapter,

           Metro Seniors in Action, Tenth Congressional District AFL-

           CIO, Champaign County Health Care Consumers, Citizen

           Advocacy Center and Coalition of Citizens With Disabilities in

           Illinois, (9) Illinois State Bar Association, (10) National

           Association for the Advancement of Colored People and the

           Cook County Bar Association, (11) Illinois NOW Legal and

           Education Fund and Breast Implant Information Exchange, (12)

           Chicago Bar Association and (13) the Brotherhood of Heat and

           Frost Insulators, Local 17, and the Southeast Environmental

           Task Force.

             The parties agree that Public Act 89--7 effects substantial

           changes to numerous aspects of tort law. The parties further

           agree that the challenged provisions of Public Act 89--7 pertain

           primarily to personal injury actions as distinct from business-

           related torts, defamation, or other actions not involving physical

           injury. There is also no dispute that the heart of Public Act 89--

           7 is the $500,000 limit on compensatory damages for injuries

           that are considered "non-economic" in nature (735 ILCS 5/2--

           1115.1 (West 1996)).

             Defendants characterize the Act as a legitimate reform

           measure that is within the scope of the Illinois General

           Assembly's power to change the common law, shape public

           policy, and regulate the state's economic health. Plaintiffs

           counter that the Act uses the guise of reform to erect arbitrary

           and irrational barriers to meritorious claims, and, therefore, that

           the Act violates the Illinois Constitution of 1970. Specifically,

           plaintiffs maintain that the following constitutional provisions

           are violated by various aspects of the legislation at issue: special

           legislation (Ill. Const. 1970, art. IV, sec. 13), equal protection

           and due process (Ill. Const. 1970, art. I, sec. 2), separation of

           powers (Ill. Const. 1970, art. II, sec. 1), right to a jury (Ill.

           Const. 1970, art. I, sec. 13) and right to a certain remedy (Ill.

           Const. 1970, art. I, sec. 12).

             The role of this court in considering the constitutionality of

           Public Act 89--7 is not to judge the prudence of the General

           Assembly's decision that reform of the civil justice system is

           needed. We recognize that we should not and need not balance

           the advantages and disadvantages of reform. See People v.

           Warren, 173 Ill. 2d 348 (1996); see also Cutinello v. Whitley,

           161 Ill. 2d 409 (1994). Rather, as the highest court in this state,

           we must determine the meaning and effect of the Illinois

           Constitution in light of the challenges made to the legislation in

           issue. Warren, 173 Ill. 2d at 355-56.

             Courts should begin any constitutional analysis with the

           presumption that the challenged legislation is constitutional

           (People v. Shephard, 152 Ill. 2d 489 (1992)), and it is the

           plaintiff's burden to clearly establish that the challenged

           provisions are unconstitutional (Bernier v. Burris, 113 Ill. 2d

           219 (1986)). However, the Illinois Constitution is not a grant,

           but a limitation on legislative power. People v. Chicago Transit

           Authority, 392 Ill. 77 (1945); Italia America Shipping Corp. v.

           Nelson, 323 Ill. 427 (1926); Taylorville Sanitary District v.

           Winslow, 317 Ill. 25 (1925). It is this court's duty to interpret

           the law and to protect the rights of individuals against acts

           beyond the scope of the legislative power. People ex rel.

           Huempfner v. Benson, 294 Ill. 236 (1920). If a statute is

           unconstitutional, this court is obligated to declare it invalid.

           Wilson v. Department of Revenue, 169 Ill. 2d 306 (1996). This

           duty cannot be evaded or neglected, no matter how desirable or

           beneficial the legislation may appear to be. Wilson, 169 Ill. 2d

           at 310; Grasse v. Dealer's Transport Co., 412 Ill. 179, 190

           (1952).

             For the reasons stated below, we determine that the

           following provisions of Public Act 89--7 violate the Illinois

           Constitution: (1) the limitation on compensatory damages for

           noneconomic injury (735 ILCS 5/2--1115.1 (West 1996)), (2)

           section 3.5(a) of the Joint Tortfeasor Contribution Act (740

           ILCS 100/3.5(a) (West 1996)), (3) the abolition of joint and

           several liability (735 ILCS 5/2--1117 (West 1996)), and (4) the

           discovery statutes which mandate the unlimited disclosure of

           plaintiffs' medical information and records (735 ILCS 5/2--

           1003, 8--802, 8--2001, 8--2003 (West 1996)). We further hold

           that because these unconstitutional provisions may not be

           severed from the remainder of the act, Public Act 89--7 as a

           whole is invalid.

           

                     BACKGROUND

             Plaintiff, Vernon Best, was injured on July 24, 1995, while

           he was operating a forklift for his employer, Laclede Steel

           Company, in Alton, Illinois. The forklift was designed and

           manufactured by Taylor Machine Works (Taylor) and sold by

           Allied Industrial Equipment Corporation (Allied). Best sustained

           injuries when the forklift's mast and support assembly collapsed

           while Best was moving slabs of hot steel. As a result of the

           collapse, flammable hydraulic fluid manufactured by Lee Helms,

           Inc. (Helms), ignited and engulfed Best in a fireball. While on

           fire, Best leaped from the cab of the forklift and fractured both

           heels. Best also suffered second and third degree burns over

           40% of his body, including his face, torso, arms and hands.

             Best filed a product liability action seeking damages against

           Taylor, Allied and Helms. In his amended complaint, Best

           alleges that the forklift and hydraulic fluid were defective and

           not reasonably safe. As to Taylor and Allied, Best alleges strict

           product liability, negligence, breaches of implied and express

           warranties, and breach of warranty for a particular purpose. As

           to Helms, Best alleges strict product liability, negligence and

           breach of implied warranty.

             Best alleges that he sustained lost earnings, he anticipates

           diminished future earnings, he has incurred past medical

           expenses, and he will incur future medical expenses as a result

           of his injuries. Best anticipates that he will need vocational

           rehabilitation and convalescent care because of his injuries. He

           further alleges that his injuries are severe, disfiguring and

           permanent. Best states that he has suffered and will continue to

           suffer from grievous pain and anguish from his injuries. He

           further asserts that he has had a painful and lengthy experience

           as a patient in a hospital burn unit, and has undergone numerous

           surgeries.

             In his amended complaint, Best seeks compensatory

           damages for all injuries. Best alleges that he has and will incur

           noneconomic damages in excess of $500,000. He also seeks

           declaratory and injunctive relief against Public Act 89--7 on the

           grounds that the Act violates the Illinois Constitution.

             The second action arises out of the death of 20-year-old

           Steven Kelso, who was killed by a train at a railroad crossing

           in Madison County, Illinois, on December 12, 1995. At the time

           of his death, Kelso was driving a truck for his employer. Union

           Pacific owned the train that killed Kelso, and Donald Cain

           operated the train at the time of Kelso's death.

             Plaintiff Jonathan Isbell, the administrator of Kelso's estate,

           filed a complaint against Union Pacific and Cain. In the

           complaint, Isbell alleges that the train that killed Kelso was

           negligently operated. He states that the train's speed was

           excessive, it did not adequately warn of its approach, and it

           failed to slow or stop before the crash. The complaint also

           alleges that the railroad crossing was negligently constructed,

           inspected, and maintained, with inadequate warning signals and

           other deficiencies. Isbell seeks damages under the Wrongful

           Death Act (740 ILCS 180/1 (West 1996)), the Probate Act of

           1975 (755 ILCS 5/27--6 (West 1996)) and the Rights of Married

           Persons Act (750 ILCS 65/15 (West 1996)). Like Best, Isbell

           also seeks declaratory and injunctive relief challenging the

           constitutionality of Public Act 89--7.

             In the circuit court, defendants in both actions moved to

           dismiss the counts for declaratory and injunctive relief, on the

           grounds that the constitutionality of Public Act 89--7 was not

           ripe for adjudication. Both plaintiffs filed motions for partial

           summary judgment on those counts, and entreated the circuit

           court to invalidate Public Act 89--7. Plaintiffs filed expert

           opinion affidavits in support of their partial motions for

           summary judgment. Defendants did not file counteraffidavits.

             Upon consolidating the cases, the circuit court denied

           defendants' motions to dismiss, and granted plaintiffs' motions

           for partial summary judgment. The circuit court ruled that 15

           specific provisions of Public Act 89--7 were unconstitutional

           and that the Act as a whole was unconstitutional. The court

           noted that the Act overruled more than 70 decisions of this court

           and the appellate court, and constituted a "wholesale

           reconstruction of the judiciary." Pursuant to Supreme Court Rule

           302(a) (134 Ill. 2d R. 302(a)), defendants appealed directly to

           this court from the circuit court's order declaring Public Act 89-

           -7 invalid.

           

                      ANALYSIS

             Initially, we note that in striking down Public Act 89--7, the

           circuit court referenced the "demeanor" of the legislature during

           consideration of the Act, as shown by the legislative history.

           The history of Public Act 89--7 shows that the Act was initially

           introduced in the House of Representative as House Bill 20, on

           November 30, 1994. See generally 25 ILCS 25/2 (West 1994).

           The legislative synopsis indicates that Public Act 89--7 made "a

           technical change in a provision relating to product liability

           actions." House Bill 20 consisted of a suggestion that the word

           "any" be changed to "a" in the first sentence of section 2--621

           of the Code of Civil Procedure (735 ILCS 5/2--621 (West

           1992)).

             More than two months later, on February 14, 1995, House

           Bill 20 was released to members of the House as "amended."

           The amendment to House Bill 20 consisted of 67 pages of text,

           and mirrors the currently enacted provisions of Public Act 89--7

           now before this court. On February 15, 1995, the House

           Executive Committee held a meeting to consider House Bill 20,

           and approved it without change. The day following committee

           approval, House Bill 20 was presented to the full House of

           Representatives. A majority of the House voted in favor of

           House Bill 20.

             Two weeks later, the Illinois Senate Judiciary Committee

           held a two-day hearing to consider House Bill 20, and voted to

           adopt it without change. The bill went to the Senate, where it

           received the votes necessary for adoption. On March 9, 1995,

           House Bill 20 was signed into law as Public Act 89--7.

             Before the circuit court, plaintiffs argued, and the court

           agreed, that the "fast track" stratagem adopted by the bill's

           proponents was designed to curtail deliberation of the bill.

           Defendants agree that the passage of Public Act 89--7 was swift

           and drew significant objections on the grounds that adequate

           time for debate was lacking. However, defendants contend that

           this fact is not relevant to the determination of the constitutional

           issues before this court. Because the manner in which Public

           Act 89--7 was passed is not dispositive of the merits of the

           constitutional challenges raised by plaintiffs, we do not further

           consider its genesis. We note, however, that the legislative

           history of Public Act 89--7 may be considered in ascertaining

           the intent of the legislature if the resolution of an issue so

           requires. See, e.g., People ex rel. Chicago Bar Ass'n v. State

           Board of Elections, 136 Ill. 2d 513, 537 (1990) (legislative

           history is relevant to severability analysis).

           

                     I. Ripeness

             In the circuit court, pursuant to section 2--615 of the Code

           of Civil Procedure (735 ILCS 5/2--615 (West 1992)), defendants

           moved to dismiss plaintiffs' counts for injunctive and

           declaratory relief on the grounds that they were not ripe for

           adjudication. The circuit court rejected defendants' arguments

           and determined that plaintiffs had standing and that the issues

           were ripe.

             Before this court, defendants maintain that the majority of

           the circuit court's rulings do not involve an actual case or

           controversy, which is required to sustain an action for

           declaratory judgment. They argue that the underlying facts and

           issues in this case are so premature as to require the court to

           pass judgment on mere abstract propositions of law, or render

           an advisory opinion.

             The question of ripeness requires a determination with

           respect to whether there is a case or controversy under section

           2--701 of the Code of Civil Procedure (735 ILCS 5/2--701

           (West 1992)). A complaint for declaratory judgment must recite

           in sufficient detail an actual and legal controversy between the

           parties and must demonstrate that the plaintiff is interested in

           the controversy. First of America Bank, Rockford, N.A. v.

           Netsch, 166 Ill. 2d 165 (1995) (declaratory judgment actions

           permit early resolution of dispositive issues, to fix rights of

           parties before irrevocable change in their positions jeopardizes

           their claims of right); see also Illinois Gamefowl Breeders Ass'n

           v. Block, 75 Ill. 2d 443 (1979). This court has repeatedly held

           that the declaratory judgment statute must be liberally construed

           and should not be restricted by unduly technical interpretations.

           See, e.g., Netsch, 166 Ill. 2d at 174.

             We believe that plaintiffs' complaint challenging the

           constitutionality of Public Act 89--7 portends "the ripening seeds

           of litigation." Miles Kimball Co. v. Anderson, 128 Ill. App. 3d

           805, 807 (1984). For example, plaintiff Best asserts a product

           liability claim to recover compensatory damages for bodily

           injuries allegedly sustained at the hands of defendants Allied,

           Taylor, and Helms. Best alleges that his compensatory damages

           for noneconomic injuries will exceed $500,000. Public Act 89--

           7, inter alia, limits such damages to $500,000 in all negligence

           and product liability actions brought on account of death, bodily

           injury, or physical damage to property. See 735 ILCS 5/2--

           1115.1 (West 1996). The limitation applies irrespective of

           whether the court or jury otherwise would have found a larger

           amount to be appropriate under the facts of the particular case.

             We believe that plaintiffs have alleged a sufficient and

           direct interest in the application of the challenged provisions of

           Public Act 89--7 to their lawsuits. In deciding the

           constitutionality of Public Act 89--7 we are not ruling on mere

           abstract principles of law or prematurely deciding issues in the

           absence of an actual case or controversy. The course of future

           litigation in these consolidated cases necessarily will be

           controlled by resolution of the constitutional challenges to

           Public Act 89--7. We hold that the issues presented in the

           instant controversy are ripe for review.

           

           II. The Cap on Noneconomic Damages

             Plaintiffs challenge the $500,000 limit on compensatory

           damages for noneconomic injuries set forth in section 2--1115.1

           of the Code of Civil Procedure (735 ILCS 5/2--1115.1 (West

           1996)).

           

           

           A. Background to Section 2--1115.1

            Section 2--1115.1(a) provides:

                      "In all common law, statutory or other actions that

                          seek damages on account of death, bodily injury, or

                          physical damage to property based on negligence, or

                          product liability based on any theory or doctrine,

                          recovery of non-economic damages shall be limited to

                          $500,000 per plaintiff. There shall be no recovery for

                          hedonic damages." 735 ILCS 5/2--1115.1(a) (West

                          1996).

             Section 2--1115.1(d) provides that nothing in section 2--

           1115.1 shall be construed to create a right to recover

           noneconomic damages. The statute defines "non-economic

           damages" as "damages which are intangible, including but not

           limited to damages for pain and suffering, disability,

           disfigurement, loss of consortium, and loss of society." 735

           ILCS 5/2--1115.2(b) (West 1996). Economic damages, defined

           as "all damages which are tangible, such as damages for past

           and future medical expenses, loss of income or earnings and

           other property loss" (735 ILCS 5/2--1115.2(a) (West 1996)), are

           not limited. By its terms, the statute defines "compensatory" or

           "actual" damages as "the sum of economic and non-economic

           damages." 735 ILCS 5/2--1115.2(c) (West 1996). Thus,

           compensatory damages, i.e., damages which are intended to

           make an injured plaintiff whole, are limited by section 2--

           1115.1.

             The cap on compensatory damages for noneconomic injury

           is, as the parties acknowledge, at the heart of Public Act 89--7.

           The key role of this cap is reflected in the preamble to the Act,

           which contains 18 specific "findings" and eight listed "purposes"

           based on those findings. Eight of the 18 findings in the

           preamble pertain to noneconomic damages. These findings

           declare that: (1) limiting noneconomic damages will improve

           health care in rural Illinois, (2) more than 20 states limit

           noneconomic damages, (3) the cost of health care has decreased

           in those states, (4) noneconomic losses have no monetary

           dimension, and no objective criteria or jurisprudence exists for

           assessing or reviewing noneconomic damages awards, (5) such

           awards are highly erratic and depend on subjective preferences

           of the trier of fact, (6) highly erratic noneconomic damages

           awards subvert the credibility of such awards and undercut the

           deterrent function of tort law, (7) such awards must be limited

           to provide consistency and stability for all parties and society

           and (8) "a federal executive branch working group" determined

           that limiting noneconomic damages was the most effective step

           toward legislative reform of tort law because it reduces litigation

           costs and expedites settlement.

             In addition to the above legislative "findings," the preamble

           to Public Act 89--7 states legislative "purposes" which relate to

           the limit on noneconomic damages. These purposes may be

           summarized as follows: reduce the cost of health care and

           increase accessibility to health care, promote consistency in

           awards, reestablish the credibility of the civil justice system,

           establish parameters or guidelines for noneconomic damages,

           protect the economic health of the state by decreasing systemic

           costs, and ensure the affordability of insurance.

             The preamble also declares, "It is the public policy of this

           State that injured persons injured through negligence or

           deliberate misconduct of another be afforded a legal mechanism

           to seek compensation for their injuries."

             In the circuit court, defendants maintained that the Act and

           its specified goals represent a return to fairness, predictability,

           responsibility and rationality in the tort arena. Specifically,

           defendants argued that the limit on noneconomic damages

           provides rationality to the system of awarding damages for

           personal injury.

             Plaintiffs, in their motion for partial summary judgment,

           challenged the legislature's use of chiefly anecdotal evidence to

           justify the Act.[fn1] Citing a 1992 report from the National

           Center for State Courts, plaintiffs noted that businesses, not

           private personal injury plaintiffs, constitute the most active

           group of litigants in the state. Plaintiffs further argued that the

           uncontested empirical evidence that they presented in

           conjunction with their motion clearly shows that the legislative

           "findings" listed in the preamble do not provide a rational

           justification for the limitation of compensatory damages for

           noneconomic injuries. In support, plaintiffs submitted several

           affidavits with their motion for summary judgment on the

           constitutionality of section 2--1115.1.

             Neil Vidmar, Professor of Social Science and Law at Duke

           Law School in Durham, North Carolina, submitted an affidavit

           in which he explains that many of the assertions about medical

           malpractice litigation contained in the preamble of Public Act

           89--7, as well as statements made at the hearing and debates

           which preceded its passage, have no empirical basis and were

           based on unsubstantiated perceptions or unreliable data. For

           example, the perception that damages caps result in a decrease

           in the number of medical malpractice cases filed was rebutted

           by the experience in Indiana, a state in which damages caps

           were adopted in 1975. Vidmar cites studies revealing that

           Indiana actually has experienced an increase in claims. See E.

           Kinney, W. Gronfein & T. Gannon, Indiana's Medical

           Malpractice Act: Results of a Three-Year Study, 24 Ind. L. Rev.

           1275, 1286 (1991). Vidmar states that he is aware of no reliable

           evidence in the formal studies which indicate that a limit on

           noneconomic damages corresponds to a significant impact on

           the cost or availability of health care or that noneconomic

           damages and the costs of liability insurance are directly linked.

             In a separate affidavit, Marc Galanter, Evjue-Bascom

           Professor of Law at the University of Wisconsin Law School,

           agrees that there is little evidence, apart from anecdotes, to

           support the perceived deleterious effects of the present civil

           litigation system. He cites to an article he authored entitled Real

           World Torts: An Antidote to Anecdote, 55 Md. L. Rev. 1093

           (1996). He maintains that the only consequences which clearly

           flow from the passage of Public Act 89--7 are increased

           profitability of insurance companies and a reduction in the

           payments to the most seriously injured tort victims. According

           to Galanter, court filings in the law division of the circuit court

           of Cook County have actually declined during the period from

           1980 to 1994. Galanter asserts that arguments which rely on

           systemic costs of the civil litigation system and its negative

           effect on health care and jobs are purely speculative. Similarly,

           he states that the salutary effects attributed to the type of tort

           reform attempted in Public Act 89--7 are largely speculative.

           Galanter concludes that when comparing isolated instances or

           anecdotal evidence against the reliable empirical data that does

           exist, it is apparent that the findings which form the basis for

           Public Act 89--7 are erroneous.

             In addition to the above affidavits, plaintiffs offered the

           joint affidavit of Stephen Daniels, M.A., Ph.D., a senior research

           fellow at the American Bar Foundation in Chicago, and Joanne

           Martin, M.M., J.D., an assistant director of the same foundation.

           Their affidavit summarizes the key empirical findings of

           scholarly literature and compares them to the factual

           underpinnings of Public Act 89--7. Like Vidmar and Galanter,

           Daniels and Martin state that the facts which form the stated

           intention or goals of Public Act 89--7 are not substantiated by

           the empirical data and critical analyses found in published,

           scholarly literature. Daniels and Martin summarize data which

           show that only a tiny fraction of accidental deaths and injuries

           are pursued through the litigation system as claims for

           compensation. They further maintain, based on studies, that jury

           awards are not erratic or capricious, but rather relate closely to

           the severity of the particular injury.

             After considering the arguments of the parties and the

           materials presented, the circuit court invalidated section 2--

           1115.1 on the grounds that it violated the following provisions

           of the Illinois Constitution: special legislation (Ill. Const. 1970,

           art. IV, sec. 13), equal protection and due process (Ill. Const.

           1970, art. I, sec. 2), separation of powers (Ill. Const. 1970, art.

           II, sec. 1), right to a jury (Ill. Const. 1970, art. I, sec. 13) and

           right to a certain remedy (Ill. Const. 1970, art. I, sec. 12). The

           circuit court held that "no conceivable argument [could] be

           made in good faith to suggest that arbitrarily limiting

           [compensatory] damages complies with the [Illinois

           Constitution]." The court determined that section 2--1115.1

           constitutes special legislation because it eliminates fairness and

           impartiality in the awarding of compensatory damages, thereby

           bestowing on certain tortfeasors a disproportionate, undeserved

           benefit of escaping liability for a portion of compensatory

           damages. The court further found that the affidavits filed in

           support of plaintiffs' opposition to the findings in the preamble

           to Public Act 89--7 demonstrate that there is no rational basis

           for section 2--1115.1.

             Our review of the circuit court's ruling is de novo. See

           Bernier, 113 Ill. 2d at 230. As such, our scope of review is not

           limited to or bound by any specific material relied upon by the

           circuit court. We acknowledge that the trial court considered the

           affidavits of Vidmar, Galanter, Martin and Daniels in its ruling

           on plaintiffs' motions for partial summary judgment. The

           materials were admitted in support of plaintiffs' claim that the

           provisions of the Act are not rationally related to its purposes.

           While we note that it was permissible for plaintiffs to introduce

           empirical evidence by way of affidavit, plaintiffs may not

           prevail on their constitutional challenges merely by showing that

           the General Assembly was mistaken in its legislative findings of

           fact. Bernier, 113 Ill. 2d at 229-30, citing United States v.

           Carolene Products Co., 304 U.S. 144, 153-54, 82 L. Ed. 1234,

           1242, 58 S. Ct. 778, 784 (1938). Courts are not empowered to

           "adjudicate" the accuracy of legislative findings. The legislative

           fact-finding authority is broad and should be accorded great

           deference by the judiciary. Therefore, to the extent the affidavits

           of record may have been offered to contest the wisdom of the

           legislative enactment, we reiterate that the legislature is not

           required to convince this court of the correctness of its judgment

           that the civil justice system needs reform. See Bernier, 113 Ill.

           2d at 229, citing Vance v. Bradley, 440 U.S. 93, 111, 59 L. Ed.

           2d 171, 184-85, 99 S. Ct. 939, 949-50 (1979); see also Cutinello

           v. Whitley, 161 Ill. 2d 409 (1994). Our task is limited to

           determining whether the challenged legislation is constitutional,

           and not whether it is wise. Bernier, 113 Ill. 2d at 230.

           

               B. Special Legislation

             In this court, plaintiffs challenge the constitutionality of the

           damages cap, section 2--1115.1, on the basis that it violates the

           special legislation clause of the Illinois Constitution (Ill. Const.

           1970, art. IV, sec. 13). Plaintiffs maintain that for individuals

           whose injuries are minor or moderate, the limit will rarely, if

           ever, be implicated. Instead, the limit is imposed only when a

           jury or trial court finds, and the reviewing court agrees, that an

           award of compensatory noneconomic damages in excess of

           $500,000 is required to make the plaintiff whole. According to

           plaintiffs, section 2--1115.1 impermissibly penalizes the most

           severely injured individuals, whose pain and suffering,

           disfigurement, and other noneconomic injuries would be most

           likely to result in a compensatory award in excess of $500,000

           but for the statutory limit. Similarly, plaintiffs reason, the

           damages cap arbitrarily benefits certain tortfeasors, who are

           relieved of liability for fully compensating plaintiffs. Thus,

           plaintiffs maintain, section 2--1115.1 constitutes special

           legislation.

             The special legislation clause of the Illinois Constitution

           provides:

                      "The General Assembly shall pass no special or local

                          law when a general law is or can be made applicable.

                          Whether a general law is or can be made applicable

                          shall be a matter for judicial determination." (Emphasis

                          added.) Ill. Const. 1970, art. IV, sec. 13.

              It has been noted that the prohibition against special

           legislation is the "one provision in the legislative articles that

           specifically limits the lawmaking power of the General

           Assembly." S. Grove & R. Carlson, The Legislature, in Con-

           Con: Issues for the Illinois Constitutional Convention 101, 103

           (1970). The special legislation clause expressly prohibits the

           General Assembly from conferring a special benefit or exclusive

           privilege on a person or a group of persons to the exclusion of

           others similarly situated. In re Petition of the Village of Vernon

           Hills, 168 Ill. 2d 117, 122 (1995). This court has consistently

           held that the purpose of the special legislation clause is to

           prevent arbitrary legislative classifications that discriminate in

           favor of a select group without a sound, reasonable basis.

           Wright v. Central Du Page Hospital Ass'n, 63 Ill. 2d 313 (1976)

           (invalidating $500,000 cap on damages in medical malpractice

           actions); Grace v. Howlett, 51 Ill. 2d 478 (1972) (striking

           classifications that conditioned recovery for personal injuries

           upon fortuity of whether negligent driver was using vehicle for

           commercial or private purposes); Grasse v. Dealer's Transport

           Co., 412 Ill. 179 (1952) (invalidating discriminatory

           classifications of employers, employees, and third-party

           tortfeasors in workers' compensation provision).

             Special legislation analysis is deeply embedded in the

           constitutional jurisprudence of this state. The ban on special

           legislation originally arose in the nineteenth century in response

           to the General Assembly's abuse of the legislative process by

           granting special charters for various economic entities. D.

           Ruder, Business Regulation: Corporations, in Con-Con: Issues

           for the Illinois Constitutional Convention 382, 382-83 (1970).

           The special legislation clause in the Constitution of 1870

           enumerated over 20 specific categories in which the General

           Assembly was prohibited from passing a local or special law.

           Ill. Const. 1870, art. IV, sec. 22. The distinction between special

           and local laws may be stated as follows:

               "A local law is one which applies only to the

                          government of a portion of the territory of the state, and

                          a special law is one which applies only to a portion of

                          the state--its people, its institutions, its economy--in

                          some sense other than geographical." G. Braden & R.

                          Cohn, The Illinois Constitution: An Annotated &

                          Comparative Analysis 206-07 (1969).

             Delegates to the 1870 constitutional convention criticized

           special legislation because, instead of establishing and enforcing

           general principles applicable to every class of citizens, special

           legislation enriched particular classes of individuals at the

           expense of others. I Debates and Proceedings of the

           Constitutional Convention of the State of Illinois 578 (remarks

           of Delegate Anderson). Delegate Anderson spoke in favor of the

           prohibition against special legislation and stated:

               "Governments were not made to make the `rich richer

                          and the poor poorer,' nor to advance the interest of the

                          few against the many; but that the weak might be

                          protected from the will of the strong; that the poor

                          might enjoy the same rights with the rich; that one

                          species of property might be as free as another--that one

                          class or interest should not flourish by the aid of

                          government, whilst another is oppressed with all the

                          burdens." I Debates, at 578 (remarks of Delegate

                          Anderson).

             Evidently in recognition of the value of the prohibition

           against special legislation, the framers of the Illinois

           Constitution of 1970 decided to retain the clause, with some

           modifications. See Anderson v. Wagner, 79 Ill. 2d 295, 313-14

           (1979). First, because the enumerated categories in the

           constitution of 1870 clearly reflected the nineteenth century

           concerns which had lost their relevance with the passage of

           time, the framers of the 1970 constitution omitted the "laundry

           list" of prohibited categories. See G. Braden & R. Cohn, The

           Illinois Constitution: An Annotated & Comparative Analysis

           225-26 (1969). Additionally, the 1970 constitution rejected the

           previous rule which had vested in the legislature the power to

           determine whether a general law could be made applicable.

           Bridgewater v. Hotz, 51 Ill. 2d 103, 110 (1972). Thus, the

           present version of the special legislation clause contains an

           express grant of power to the judiciary: "Whether a general law

           is or can be made applicable shall be a matter for judicial

           determination." Ill. Const. 1970, art. IV, sec. 13.

             The framers of the 1970 constitution retained the special

           legislation prohibition even though an equal protection/due

           process clause was included in the Illinois Constitution for the

           first time. See Ill. Const. 1970, art. I, sec. 2 ("No person shall

           be deprived of life, liberty or property without due process of

           law nor be denied the equal protection of the laws").

             A special legislation challenge generally is judged under the

           same standards applicable to an equal protection challenge.

           Village of Vernon Hills, 168 Ill. 2d at 123. Public Act 89--7

           does not affect a fundamental right or involve a suspect or

           quasi-suspect classification. See Bernier, 113 Ill. 2d at 227-

           29.[fn2]  Thus, the appropriate standard for our review of

           Public Act 89--7 is the rational basis test. "Under this standard,

           a court must determine whether the statutory classification is

           rationally related to a legitimate State interest." Village of

           Vernon Hills, 168 Ill. 2d at 123.

             Our task in determining whether the damages cap violates

           the special legislation clause is not without difficulty. See

           Grasse, 412 Ill. at 194. Indeed, the dilemma in discerning

           whether or not a particular statute constitutes special legislation

           has been described as follows:

               "It is impossible to conceive of a law that has universal

                          impact and affects everyone or everything in the same

                          way. By enacting laws, the legislature can hardly avoid

                          excluding some category of people or objects. In

                          enforcing this prohibition, the courts must decide if the

                          legislature has made a reasonable classification.

                          Differences of opinion are bound to exist in such

                          situations and the ultimate decision must rest with some

                          judgment as to the soundness of the legislature's

                          action." S. Grove & R. Carlson, The Legislature, in

                          Con-Con: Issues for the Illinois Constitutional

                          Convention 106 (1970).

             The difficulty is not overcome by merely reiterating that a

           classification has been made, i.e., that the legislature has in

           some way classified groups of people. Rather, we must

           determine whether the classifications created by section 2--

           1115.1 are based upon reasonable differences in kind or

           situation, and whether the basis for the classifications is

           sufficiently related to the evil to be obviated by the statute.

           Grasse, 412 Ill. at 195. We note that the legislature has wide

           discretion in the exercise of its police power. However, in

           evaluating a challenged provision the court must consider the

           natural and reasonable effect of the legislation on the rights

           affected by the provision. Grasse, 412 Ill. at 193.

             While it is unnecessary to discuss every Illinois Supreme

           Court case which has evaluated legislation in the context of the

           special legislation clause, we note the many cases cited by both

           plaintiffs and defendants in the case at bar. Defendants cite

           numerous cases in which this court has rejected challenges to

           legislation on special legislation and equal protection grounds.

           See, e.g., Brown's Furniture, Inc. v. Wagner, 171 Ill. 2d 410

           (1996) (upholding constitutionality of a use tax); Cutinello v.

           Whitley, 161 Ill. 2d 409 (1994) (upholding constitutionality of

           a county motor fuel tax law); People v. Shephard, 152 Ill. 2d

           489 (1992) (upholding constitutionality of criminal statute which

           allowed an enhanced penalty for selling narcotics with an intent

           to deliver if the situs of the crime is within 1,000 feet of public

           housing); Chicago National League Ball Club, Inc. v.

           Thompson, 108 Ill. 2d 357 (1985) (upholding constitutionality

           of an environmental regulation which monitored nighttime

           baseball games); Bilyk v. Chicago Transit Authority, 125 Ill. 2d

           230 (1988) (upholding constitutionality of immunity for a transit

           authority for failure to protect against criminal acts of third

           parties).

             In contrast to the above cases, this court has invalidated

           legislative classifications under the special legislation clause

           where they have an artificially narrow focus and which appear

           to be designed primarily to confer a benefit on a particular

           private group without a reasonable basis, rather than to promote

           the general welfare. See, e.g., In re Belmont Fire Protection

           District, 111 Ill. 2d 373, 381-86 (1986) (invalidating a statute

           which authorized only counties with populations of between

           600,000 and 1 million residents to consolidate all fire protection

           services into one district); Wright v. Central Du Page Hospital

           Ass'n, 63 Ill. 2d 313, 325-30 (1976) (invalidating $500,000 limit

           on compensatory damages in medical malpractice actions);

           Grace v. Howlett, 51 Ill. 2d 478, 486-87 (1972) (invalidating a

           limit on recovery applicable to damages inflicted by commercial

           motorists, but not private motorists); Skinner v. Anderson, 38 Ill.

           2d 455, 459-60 (1967) (invalidating a statute of repose for

           construction-related injuries for architects and contractors, but

           not other potential defendants in the construction process); see

           also Lorton v. Brown County Community Unit School District

           No. I, 35 Ill. 2d 362, 364-66 (1966); Hutchings v. Kraject, 34

           Ill. 2d 379, 380-82 (1966); Harvey v. Clyde Park District, 32 Ill.

           2d 60, 64-67 (1964). As the above-cited cases reveal, the

           hallmark of an unconstitutional classification is its arbitrary

           application to similarly situated individuals without adequate

           justification or connection to the purpose of the statute.

             In the case at bar, plaintiffs specifically rely on the

           following three decisions of this court which held invalid as

           special legislation certain statutes which created arbitrary

           classifications between groups of similarly situated injured

           plaintiffs or tortfeasors: Wright v. Central Du Page Hospital

           Ass'n, 63 Ill. 2d 313 (1976); Grace v. Howlett, 51 Ill. 2d 478

           (1972); Grasse v. Dealer's Transport Co., 412 Ill. 179 (1952).

           Because plaintiffs maintain that these precedents of this court

           are controlling with respect to the constitutionality of section 2--

           1115.1, we discuss them in detail.

             In Wright, this court held that a $500,000 limit on

           compensatory damages in medical malpractice actions (Ill. Rev.

           Stat. 1975, ch. 70, par. 101) violated the equal protection and

           special legislation provisions of the Illinois Constitution. Like

           plaintiffs in the case at bar, the plaintiff in Wright argued that

           the compensatory damages limit arbitrarily classified and

           unreasonably discriminated against the most seriously injured

           victims of medical malpractice. Like defendants in the case at

           bar, the defendants in Wright argued that a compensatory

           damage limit was necessary to manage a liability crisis,

           specifically a "medical malpractice crisis." The plaintiff

           maintained, however, that the burden of the legislative effort to

           reduce or maintain malpractice insurance premiums arbitrarily

           fell exclusively on those most deserving of compensation: the

           severely injured.

             The Wright court noted that unlike statutorily created causes

           of action (see Hall v. Gillins, 13 Ill. 2d 26 (1958); Cunningham

           v. Brown, 22 Ill. 2d 23 (1961)), the right to recover for injuries

           arising from medical malpractice existed at common law.[fn3]

           See Ritchey v. West, 23 Ill. 329 (1860). Thus, the limitations on

           that right of action were subject to constitutional scrutiny.

           Specifically, in Wright, this court concluded that the General

           Assembly did not have the power to prescribe arbitrary

           limitations on an injured plaintiff's compensatory damages. The

           limitation on compensatory damages in medical malpractice

           actions was determined to be arbitrary and a special law in

           violation of the special legislation clause of the Illinois

           Constitution of 1970. The damages limit conferred a special

           privilege on medical malpractice tortfeasors by insulating them

           from fully compensating plaintiffs for fairly assessed damages.

           Consequently, relief to an injured plaintiff depended solely on

           an arbitrary classification, in violation of the prohibition against

           special legislation. Wright, 63 Ill. 2d at 329-30.

             Similarly, in Grace, this court held that a statute which

           limited recovery for certain automobile accident victims

           constituted an arbitrary and unreasonable legislative

           classification in violation of the prohibition against special

           legislation. At issue in Grace was a newly enacted article to the

           Illinois Insurance Code (Ill. Rev. Stat. 1971, ch. 73, pars.

           1065.150 through 1065.163). The plaintiffs brought an action for

           injunctive relief against state officers to enjoin them from

           expending funds appropriated for the enforcement of the new

           article. The combined effect of certain provisions of the new

           law was to limit an injured plaintiff's ability to recover

           compensatory damages, including damages for pain and

           suffering, depending on whether the party at fault was using the

           automobile for commercial or personal purposes.

             The defendants in Grace described the amendment to the

           Insurance Code as a response to the growing public demand for

           a change in the way society copes with the enormous legal,

           social and economic problems produced by car accidents. The

           defendants identified small personal injury actions as one of the

           major evils of the system of compensating car accident victims.

           Grace, 51 Ill. 2d at 484. The defendants further maintained that

           the studies regarding car accident compensation identified many

           problems with the system of compensating injured individuals.

           Specifically, the defendants maintained that the studies showed

           the inequitable distribution of compensation among victims, the

           excessive expense of the claim system, and the excessive burden

           on limited judicial resources. According to the defendants, the

           changes to the Insurance Code were rationally connected to

           legitimate government concerns.

             In determining whether the provisions at issue violated

           special legislation and equal protection, the Grace court

           assumed that the problems described by the defendants in fact

           existed. However, the court reasoned, the fact that a problem

           exists does not permit the adoption of an arbitrary or unrelated

           means of addressing the problem. Grace, 51 Ill. 2d at 485. In

           rejecting the defendants' argument that the legislation was a

           permissible exercise of legislative power, the Grace court stated,

                      "Unless this court is to abdicate its constitutional

                          responsibility to determine whether a general law can be

                          made applicable, the available scope for legislative

                          experimentation with special legislation is limited, and

                          this court cannot rule that the legislature is free to enact

                          special legislation simply because `reform may take one

                          step at a time.' [Citation.]" Grace, 51 Ill. 2d at 487.

             This court concluded that to the extent that recovery is

           permitted or denied on an arbitrary basis, a special privilege was

           granted in violation of the prohibition against special legislation.

           Grace, 51 Ill. 2d at 487-90.

             In Grasse, this court invalidated a provision of the Worker's

           Compensation Act that created arbitrary classifications. At issue

           in Grasse was a provision which automatically transferred to an

           employer, in certain cases, an employee's common law right of

           action against a third-party tortfeasor. In Grasse, the plaintiff

           and his employer filed claims against a private defendant to

           recover damages stemming from an automobile collision which

           was allegedly caused by the negligence of the defendant's

           employee. Because both the plaintiff and defendant's employee

           were acting in the course of their employment at the time of the

           accident, paragraph 1 of section 29 of the Worker's

           Compensation Act applied to the subsequent litigation. This

           provision authorized the automatic transfer of the plaintiff-

           employee's claim against the third-party tortfeasor to the

           plaintiff's employer. The circuit court consequently dismissed

           the plaintiff's claim against the third-party tortfeasor.

             On appeal to this court, the plaintiff alleged, in part, that the

           statute violated the special legislation clause of the Illinois

           Constitution (Ill. Const. 1870, art. IV, sec. 22) because it created

           arbitrary and unreasonable classifications. This court agreed,

           holding that the statute created unreasonable classifications in

           which the plaintiff's ability to recover complete compensation

           was determined by fortuitous circumstances. The statute divided

           injured employees into two arbitrary classes based solely on the

           fortuity of whether or not the third-party tortfeasor was also

           bound by the provision. One class was deprived of the right to

           collect compensatory damages from the tortfeasor and the other

           class, which was similarly situated, was conferred such right.

           This court concluded that there was no substantial or rational

           difference between the injured employees in the two classes and,

           therefore, the statute offended the prohibition against special

           legislation.

             In addition to the unequal treatment of injured employees,

           the Grasse court determined that the statute divided third-party

           tortfeasors into two classes: those bound by the worker's

           compensation provision, who were freed from paying

           compensatory damages to employees of other entities under the

           act, and all other tortfeasors, who remained liable for the full

           amount of fairly assessed compensatory damages. The first class

           of tortfeasors were only required to pay amounts sought by the

           employer as reimbursement for worker's compensation

           payments. In contrast, the second class of tortfeasors remained

           liable to the plaintiff for the full amount of compensatory

           damages assessed by a trier of fact. Therefore, the distinctions

           were arbitrary and constituted a violation of the special

           legislation clause. Grasse, 412 Ill. 2d at 199.

             Defendants maintain that plaintiffs' reliance on Wright,

           Grace, and Grasse is misplaced. According to defendants, these

           cases were limited by Anderson v. Wagner, 79 Ill. 2d 295

           (1979), in a way that renders their holdings inapplicable to the

           legislation in the case at bar.

             At issue in Anderson was section 21.1 of the Limitations

           Act (Ill. Rev. Stat. 1977, ch. 83, par. 22.1), which provided a

           special statute of limitations period for medical malpractice

           actions against physicians and hospitals. The plaintiffs in

           Anderson contended that section 21.1 violated the due process

           and equal protection provisions of the state and federal

           constitutions, and the special legislation provision of the Illinois

           Constitution. The plaintiff maintained that section 21.1 violated

           the special legislation clause because it (1) set medical

           malpractice apart from all other professional malpractice and (2)

           conferred a special privilege upon only two classes of medical

           health providers, physicians and hospitals. Following an

           extensive analysis of the development of the discovery rule in

           medical malpractice cases, and the impact on physicians and

           hospitals, this court rejected the plaintiff's constitutional

           challenge to the statute of limitations provision at issue.

             In analyzing the plaintiff's challenges, the Anderson court

           retraced the evolution of the "discovery rule" in medical

           malpractice cases. Under the discovery rule, a cause of action

           accrued when a person learned of his injury or reasonably

           should have learned of it. Because the discovery rule came to be

           applied extensively in medical malpractice cases, statutes of

           limitation in existence no longer provided repose for malpractice

           defendants. The discovery rule was perceived to be partly

           responsible for the medical malpractice crisis because it created

           a "long tail" of liability for medical malpractice defendants.

           Thus, the statute of limitations provision at issue in Anderson

           was enacted to place an outside limit on the applicability of the

           discovery rule to physicians and hospitals. Anderson, 79 Ill. 2d

           at 316-21. We find that Anderson is distinguishable from the

           instant case because in Anderson, the General Assembly was

           responding to judicial expansion of the discovery rule, which

           had undermined the medical malpractice statute of limitation by

           creating a tolling provision of potentially unlimited duration.

             Defendants in the instant case also rely upon language in

           Anderson which responded to critics of Wright. In dicta, the

           Anderson court explained that Wright did not hold that all

           statutory provisions creating medical malpractice review panels

           were unconstitutional. The Anderson court also noted that

           Wright's holding regarding the limit on economic damages was

           consistent with American Bar Association standards which

           recommend against any limitation on economic loss. Anderson,

           79 Ill. 2d at 304. However, this court in Anderson did not

           consider the General Assembly's authority to place a limit on

           compensatory damages for noneconomic injuries. We reject

           defendants' argument that our decision in Anderson limits

           Wright's application in the case at bar.

             Plaintiffs argue that section 2--1115.1 merely stitches

           together legislative classifications previously rejected in Wright,

           Grasse and Grace, and then adds product liability cases.

           According to plaintiffs, section 2--1115.1 contains three arbitrary

           classifications that have no reasonable connection to the stated

           legislative goals: (1) the limitation on noneconomic damages

           distinguishes between slightly and severely injured individuals,

           (2) the limitation on noneconomic damages arbitrarily

           distinguishes between individuals with identical injuries, and (3)

           the limitation arbitrarily distinguishes types of injury. At oral

           argument, plaintiffs offered examples illustrating how the

           limitation on noneconomic damages is disconnected from the

           stated legislative purposes of providing rationality and

           consistency to jury verdicts.

             In the first example, it is assumed that three plaintiffs are

           injured as a result of the same tortfeasor's negligence. Plaintiff

           A is injured moderately, and suffers pain, disability and

           disfigurement for a month. Plaintiff B is severely injured and

           suffers one year of pain and disability. Plaintiff C is drastically

           injured, and suffers permanent pain and disability. For purposes

           of this example, it is further assumed that a jury awards

           plaintiffs A and B $100,000 in compensatory damages for

           noneconomic injuries. Plaintiff C receives $1 million for his

           permanent, life-long pain and disability.

             In the above hypothetical, section 2--1115.1 fails to provide

           consistency or rationality to a jury's seemingly inconsistent

           decision to award plaintiffs A and B the same amount for very

           different noneconomic injuries. Therefore, the legislative goal of

           providing consistency is not met by the damages cap. With

           respect to plaintiff C, section 2--1115.1 arbitrarily and

           automatically reduces the jury's award for a lifetime of pain and

           disability, without regard to whether or not the verdict, before

           reduction, was reasonable and fair.

             The tortfeasors in this example are also treated differently,

           without any justification. The tortfeasor who injures plaintiffs A

           and B is liable for the full amount of fairly assessed

           compensatory damages. In contrast, section 2--1115.1 confers a

           benefit on the similarly situated tortfeasor who injures plaintiff

           C. This tortfeasor pays only a portion of fairly assessed

           compensatory damages because of the limitation in section 2--

           1115.1. Therefore, the statute discriminates between slightly and

           severely injured plaintiffs, and also between tortfeasors who

           cause severe and moderate or minor injuries.

             Plaintiffs suggest that section 2--1115.1 creates a second

           arbitrary legislative classification by distinguishing between

           injured individuals who suffer identical injuries. For example,

           we are asked to assume that an individual loses his leg due to

           a defectively manufactured forklift today, and he loses his other

           leg in a car accident the following year. Both injuries are caused

           by the negligent conduct of others. The injured individual brings

           two different actions against two different defendants, and a jury

           assesses compensatory damages for noneconomic injuries at

           $400,000 in each case. Section 2--1115.1 would allow the

           plaintiff to recover both verdicts in full. However, if the same

           plaintiff lost both legs in a single accident due to the negligence

           of another, and if the jury fairly assessed $800,000 in

           compensatory damages for noneconomic injuries, then the cap

           in section 2--1115.1 would eliminate a substantial portion of that

           tortfeasor's liability, without regard to the facts of the case.

             To illustrate the third arbitrary classification created by the

           limitation on noneconomic damages in personal injury actions,

           plaintiffs argue that section 2--1115.1 improperly discriminates

           among types of injuries. Plaintiffs maintain that the legislative

           statements concerning the supposed difficulties of assessing

           damages for noneconomic injuries apply equally to all tort

           claims for pure noneconomic loss, and not just those involving

           death, bodily injury or property damage. Other torts that remain

           unaffected by the legislation at issue are invasion of privacy,

           defamation, intentional infliction of emotional distress, negligent

           infliction of emotional distress, damage to reputation and breach

           of fiduciary duty. The speculative nature of noneconomic

           damages for these torts, which do not involve personal injury,

           is not addressed by the cap in section 2--1115.1.

             Plaintiffs maintain that the above illustrations demonstrate

           the arbitrariness of the classifications created by section 2--

           1115.1, in violation of the prohibition against special legislation.

           Plaintiffs contend that the classifications contained within

           section 2--1115.1 allow certain culpable tortfeasors to escape

           liability for a portion of fairly assessed compensatory damages,

           while requiring others to pay the full amount of assessed

           damages. Similarly, certain injured plaintiffs are denied

           compensatory damages, while other similarly situated injured

           plaintiffs are awarded full compensation, without any rational

           justification for the distinction.

             Defendants raise a series of related arguments in opposition

           to plaintiffs' contention that section 2--1115.1 is arbitrary and

           not rationally related to a legitimate government interest.

           Defendants contend that plaintiffs' arguments are "fatally

           flawed" in that they are based on the erroneous assumption that

           noneconomic injuries, which are difficult to assess, should be

           monetarily compensable. Defendants further argue that section

           2--1115.1 is rationally related to the legislative goal of reducing

           systemic costs of the civil justice system, which may be

           accomplished "one step at a time"; that the General Assembly

           has the power to change the common law; and that other

           jurisdictions have upheld statutory limitations on damages

           similar to section 2--1115.1. We address each of defendants'

           arguments in turn.

             At oral argument, in rebuttal, defendants stated that "it is

           not true that money can compensate for noneconomic damages,

           [or] at least the legislature could find that that is the case."

           Defendants do not dispute the general proposition that

           noneconomic injuries are "real." Rather, defendants argue that

           noneconomic damages are "inherently unmeasurable." Thus,

           according to defendants, the legislature's adoption of an

           "objective" limitation on noneconomic damages is reasonable

           and must be upheld as a legitimate exercise of legislative

           judgment.

             Defendants' argument contradicts the statute under

           consideration. Subsection (b) of section 2--1115.1 defines

           noneconomic loss or noneconomic damages as "damages which

           are intangible, including but not limited to damages for pain and

           suffering, disability, disfigurement, loss of consortium and loss

           of society." Subsection (c) provides that "compensatory

           damages" or "actual damages" are "the sum of the economic and

           noneconomic damages." Section 2--1115.1 itself demonstrates

           that the legislature believed that remuneration is an appropriate

           means by which to compensate tort victims for their

           noneconomic injuries. Therefore, the application of a limit to the

           noneconomic damages of some, but not all, injured plaintiffs is

           not justified by the difficulty of assessing such damages.

             We do not disagree with defendants' assertion that damages

           for noneconomic injuries are difficult to assess. We simply

           determine that it does not follow that the difficulty in

           quantifying compensatory damages for noneconomic injuries is

           alleviated by imposing an arbitrary limitation or cap on all

           cases, without regard to the facts or circumstances. Further, the

           preamble to Public Act 89--7 states that "[i]t is the public policy

           of this State that persons injured through the negligence or

           deliberate misconduct of another be afforded a legal mechanism

           to seek compensation for their injuries." Pub. Act 89--7, eff.

           March 9, 1995. There is universal agreement that the

           compensatory goal of tort law requires that an injured plaintiff

           be made whole. See, e.g., Peterson v. Lou Bachrodt Chevrolet

           Co., 76 Ill. 2d 353, 363 (1979); 25 C.J.S. Damages sec. 17

           (1966). In this case, the arbitrary and automatic cap on

           compensatory damages for noneconomic injuries in only certain

           tort cases parallels the harm of the arbitrary classifications

           stricken by this court in Wright, Grace, and Grasse. Therefore,

           the $500,000 limit does not reestablish the credibility of the tort

           system, and does nothing to assist the trier of fact in

           determining appropriate damages for noneconomic injuries. The

           limitation actually undermines the stated goal of providing

           consistency and rationality to the civil justice system.

             We reject defendants' argument that the damages cap in

           section 2--1115.1 should be upheld because reform can be

           undertaken "one step at a time." As previously noted in this

           opinion, this court has rejected the "one step" rationale to

           support a classification if the classification is arbitrary. Grace,

           51 Ill. 2d at 487. We need not address this justification further.

             Defendants also argue that the legislative interest in

           reducing the "systemic costs of tort liability" is sufficient to

           overcome plaintiffs' special legislation challenge. The "systemic

           costs of tort liability" are not defined in Public Act 89--7 and

           we are uncertain as to the meaning and scope of these terms.

           Even if we assume that the reduction of these undefined

           systemic costs is a legitimate state interest, we do not discern

           how the limiting of noneconomic damages in personal injury

           actions may be considered rationally related to the achievement

           of that interest. See Wright, 63 Ill. 2d 313 (rejecting defendants'

           argument that lower insurance premiums and medical

           malpractice costs for all recipients of medical care legitimately

           offset the loss of compensatory damages to some malpractice

           victims); Grace, 51 Ill. 2d at 487-88 (rejecting cost-based

           justification for imposing limits on the recovery of personal

           injury claims as to certain class of plaintiffs). Cf. Bernier, 113

           Ill. 2d 219 (punitive damages cap upheld).[fn4] In the instant

           case, we are unable to discern any connection between the

           automatic reduction of one type of compensatory damages

           awarded to one class of injured plaintiffs and a savings in the

           systemwide costs of litigation. Even assuming that a systemwide

           savings in costs were achieved by the cap, the prohibition

           against special legislation does not permit the entire burden of

           the anticipated cost savings to rest on one class of injured

           plaintiffs. E.g., Grace, 51 Ill. 2d at 485. We therefore reject

           defendants' systemic costs rationale as a basis for upholding

           section 2--1115.1.

             Defendants additionally argue that the General Assembly

           has the power to change the common law and, therefore, the

           limitation on compensatory damages is constitutional. See V.

           Schwartz, M. Behrens & M. Taylor, Illinois Tort Law: A Rich

           History of Cooperation and Respect Between the Courts and the

           Legislature, 28 Loy. U. Chi. L.J. 745 (1997). For example,

           defendants cite to the Worker's Compensation Act as an

           instance of the legislature's valid exercise of the police power

           in limiting liability of an employer for injuries sustained by an

           employee during the course of his or her employment. Grand

           Trunk Western Ry. Co. v. Industrial Comm'n, 291 Ill. 167

           (1919).

             Plaintiffs do not dispute that the legislature has the power

           to change the common law, and we do not question defendants'

           argument insofar as it stands for the general principle that the

           General Assembly may alter the common law and change or

           limit available remedies. This principle is well grounded in the

           jurisprudence of this state. See, e.g., Grand Trunk Western Ry.

           Co., 291 Ill. 167. However, defendants' argument assumes too

           much. The legislature is not free to enact changes to the

           common law which are not rationally related to a legitimate

           government interest. The General Assembly's authority to

           exercise its police power by altering the common law and

           limiting available remedies is also dependent upon the nature

           and scope of the particular change in the law. We hold in the

           case at bar that the statutory cap on compensatory damages for

           noneconomic losses is arbitrary.

             Finally, defendants support their contention that the

           limitation on noneconomic damages in section 2--1115.1 is

           constitutional by referring to several other state court decisions

           which have upheld damage limitations. See Fein v. Permanente

           Medical Group, 38 Cal. 3d 137, 695 P.2d 665, 211 Cal. Rptr.

           368 (1985); Samsel v. Wheeler Transport Services, Inc., 246

           Kan. 336, 789 P.2d 541 (1990); Murphy v. Edmonds, 325 Md.

           342, 601 A.2d 102 (1992); Adams v. Children's Mercy Hospital,

           832 S.W.2d 898 (Mo. 1992); Greist v. Phillips, 322 Or. 281,

           906 P.2d 789 (1995); Robinson v. Charleston Area Medical

           Center, Inc., 186 W. Va. 720, 414 S.E.2d 877 (1991); Johnson

           v. St. Vincent Hospital, Inc., 273 Ind. 374, 404 N.E.2d 585

           (1980); Etheridge v. Medical Center Hospitals, 237 Va. 87, 376

           S.E.2d 525 (1989); Butler v. Flint Goodrich Hospital of Dillard

           University, 607 So. 2d 517 (La. 1992); Prendergast v. Nelson,

           199 Neb. 97, 256 N.W.2d 657 (1977); see also Davis v.

           Omitowoju, 883 F.2d 1155 (3d Cir. 1989).

             However, other jurisdictions have held statutory damages

           caps unconstitutional. Moore v. Mobile Infirmary Ass'n, 592 So.

           2d 156, 158 (Ala. 1991); Morris v. Savoy, 61 Ohio 684, 688-89,

           576 N.E.2d 765, 769 (1991), Arneson v. Olson, 270 N.W.2d

           125, 135-36 (N.D. 1978); Lucas v. United States, 757 S.W.2d

           687, 690-92 (Tex. 1988); Sofie v. Fibreboard Corp., 112 Wash.

           2d 636, 771 P.2d 711 (1989). The amount of noneconomic

           damages caps that have been invalidated in other states varies.

           See, e.g., Smith v. Department of Insurance, 507 So. 2d 1080,

           1088-89 (Fla. 1987) ($450,000 cap); Brannigan v. Usitalo, 134

           N.H. 50, 58, 587 A.2d 1232, 1236-37 (1991) ($875,000 cap).

             The statutory caps on damages which have been enacted by

           other states vary considerably in scope and effect. Similarly, the

           state constitutional provisions and precedents under which these

           damage caps have been challenged are unique to each

           jurisdiction. Although the decisions from other states may be

           instructive in some respects, we believe that these decisions are

           of limited assistance in answering the specific question of

           whether section 2--1115.1 offends the special legislation clause

           of the Illinois Constitution. We hold that it does.

           

               C. Separation of Powers

             Plaintiffs also assert that section 2--1115.1 violates the

           separation of powers clause (Ill. Const. 1970, art. II, sec. 1) by

           improperly delegating to the legislature the power of remitting

           verdicts and judgments, which is a power unique to the

           judiciary. See Ill. Const. 1970, art. VI, sec. 1 (judicial power is

           vested in the supreme, appellate and circuit courts). According

           to plaintiffs, because section 2--1115.1 limits damages for

           noneconomic injuries, the section violates the constitutional

           separation of powers doctrine by invading the province of the

           judiciary and imposing a "one-size-fits-all `legislative

           remittitur.' " Plaintiffs argue that the cap on damages

           contravenes the traditional authority of the courts to assess, on

           a case-by-case basis, whether a jury's damages award is

           excessive.

             Defendants disagree with plaintiffs' characterization of the

           operation of section 2--1115.1 as a legislative remittitur. They

           argue that the damages cap merely "sets an outer parameter by

           which wholly subjective damages are limited" and in no respect

           displaces traditional judicial functions.

             Under our constitution, the three branches of government--

           legislative, executive, and judicial--are separate and one branch

           shall not "exercise powers properly belonging to another." Ill.

           Const. 1970, art. II, sec. 1. Although our state constitution does

           not define legislative, executive, and judicial power (People v.

           Walker, 119 Ill. 2d 465, 473 (1988)), in "both theory and

           practice, the purpose of the [separation of powers] provision is

           to ensure that the whole power of two or more branches of

           government shall not reside in the same hands." Walker, 119 Ill.

           2d at 473; Knuepfer v. Fawell, 96 Ill. 2d 284, 292 (1983).

             Each branch of government has its own unique sphere of

           authority that cannot be exercised by another branch. See, e.g.,

           Murneigh v. Gainer, 177 Ill. 2d 287, 312-13 (1997) (holding

           invalid an attempted delegation of an executive or administrative

           function to the judicial branch); Wright v. Central Du Page

           Hospital Ass'n, 63 Ill. 2d 313, 322 (1976) (holding invalid an

           attempted delegation of judicial power to nonjudicial member of

           medical malpractice review board); Fields Jeep-Eagle, Inc. v.

           Chrysler Corp., 163 Ill. 2d 462, 478-79 (1994) (holding invalid

           attempted delegation of legislative or administrative

           decisionmaking to the judiciary); see also Agran v. Checker Taxi

           Co., 412 Ill. 145, 149 (1952) ("If the power is judicial in its

           nature, it necessarily follows that the legislature is expressly

           prohibited from exercising it").

             This court has often recognized that the separation of the

           three branches of government is not absolute and unyielding.

           See, e.g., Strukoff v. Strukoff, 76 Ill. 2d 53, 58 (1979). The

           separation of powers clause is not contravened merely because

           separate spheres of governmental authority may overlap. County

           of Kane v. Carlson, 116 Ill. 2d 186, 208 (1987). However, it

           should be emphasized that the determination of when, and under

           what circumstances, a violation of the separation of powers

           doctrine has occurred remains with the judiciary. See, e.g.,

           Murneigh, 177 Ill. 2d at 303; People v. Warren, 173 Ill. 2d 348

           (1996). In furtherance of the authority of the judiciary to carry

           out its constitutional obligations, the legislature is prohibited

           from enacting laws that unduly infringe upon the inherent

           powers of judges. See, e.g., In re S.G., 175 Ill. 2d 471, 487

           (1997); Walker, 119 Ill. 2d at 474; People v. Bainter, 126 Ill. 2d

           292, 303 (1989); Agran, 412 Ill. at 149.

             For over a century it has been a traditional and inherent

           power of the judicial branch of government to apply the doctrine

           of remittitur, in appropriate and limited circumstances, to correct

           excessive jury verdicts. E.g., Hansen v. Boyd, 161 U.S. 397,

           412, 40 L. Ed. 746, 751, 16 S. Ct. 571, 576 (1896); Dimick v.

           Schiedt, 293 U.S. 474, 484-85, 79 L. Ed. 603, 610, 55 S. Ct.

           296, 300 (1935). In Dimick, 293 U.S. at 486, 79 L. Ed. at 611,

           55 S. Ct. at 301, the United States Supreme Court recognized

           that remittitur of an excessive portion of a jury verdict is a

           question of law for the court.

             The practice of ordering a remittitur of excessive damages

           has long been recognized and accepted as part of Illinois law.

           See, e.g., Richardson v. Chapman, 175 Ill. 2d 98, 113 (1997);

           Lee v. Chicago Transit Authority, 152 Ill. 2d 432 (1992); Carter

           v. Kirk, 256 Ill. App. 3d 938 (1993). The remittitur doctrine has

           been acknowledged as promoting both the administration of

           justice and the conclusion of litigation. See Carter, 256 Ill. App.

           3d at 947; McElroy v. Patton, 130 Ill. App. 2d 872, 877 (1970).

           This court has stated that "[a]n award of damages will be

           deemed excessive if it falls outside the range of fair and

           reasonable compensation or results from passion or prejudice, or

           if it is so large that it shocks the judicial conscience."

           Richardson v. Chapman, 175 Ill. 2d 98, 113 (1997). However,

           a damages award will not be subject to remittitur where it "falls

           within the flexible range of conclusions which can reasonably

           be supported by the facts" because the assessment of damages

           is primarily an issue of fact for jury determination. Lee, 152 Ill.

           2d at 470; see also Barry v. Owens-Corning Fiberglas Corp.,

           282 Ill. App. 3d 199, 207 (1996) (noting that evaluations of a

           plaintiff's pain and suffering depend on jurors' combined

           wisdom and experience); Riley v. Koneru, 228 Ill. App. 3d 883,

           887-88 (1992) (noting reluctance of courts to interfere with

           damages awards unless the award is the result of passion or

           prejudice) .

             The deference given to the careful deliberative process of

           the jury is overcome if, after examining the evidence presented

           at trial, the trial judge determines that the jury verdict is

           excessive. In such a case, "the judge may not allow the verdict

           to stand but must act to correct the injustice; and the failure to

           do so is, itself, error." Haid v. Tingle, 219 Ill. App. 3d 406, 410

           (1991). Under such circumstances the court has a duty to correct

           the excessive verdict, and may do so by ordering a remittitur of

           a portion of the damages, with the plaintiff's consent. As a

           check on excessive verdicts, therefore, the inherent power of the

           court to order a remittitur or, if the plaintiff does not consent, a

           new trial, is essential to the judicial management of trials. See

           Haid, 219 Ill. App. 3d at 412.

             Case law reflects that the application of remittitur should be

           considered on a case-by-case basis because the evidence and

           circumstances supporting verdicts must be carefully examined

           before a jury's assessment of damages is reduced. See

           Richardson v. Chapman, 175 Ill. 2d 98 (1997) (remitting one

           plaintiff's $11 million award for future medical expenses by $1

           million and reducing by half the other plaintiff's pain and

           suffering award). See also Carter v. Kirk, 256 Ill. App. 3d 938

           (1993) (finding that trial court properly granted $20,000

           remittitur where the jury's verdict was excessive because

           medical evidence failed to support the plaintiff's claims). In

           other circumstances, courts have declined to enter a remittitur,

           even in cases involving large awards, because the evidence

           supported the jury's verdicts. Cf. Holston v. Sisters of the Third

           Order of St. Francis, 165 Ill. 2d 150 (1995) (declining to reduce

           as excessive a $7.3 million verdict in a wrongful death and

           survival case); Barry, 282 Ill. App. 3d at 208 (declining to apply

           a remittitur to $12 million verdict).

             In the case at bar, we conclude that section 2--1115.1

           undercuts the power, and obligation, of the judiciary to reduce

           excessive verdicts. In our view, section 2--1115.1 functions as

           a "legislative remittitur." Unlike the traditional remittitur power

           of the judiciary, the legislative remittitur of section 2--1115.1

           disregards the jury's careful deliberative process in determining

           damages that will fairly compensate injured plaintiffs who have

           proven their causes of action. The cap on damages is mandatory

           and operates wholly apart from the specific circumstances of a

           particular plaintiff's noneconomic injuries. Therefore, section 2--

           1115.1 unduly encroaches upon the fundamentally judicial

           prerogative of determining whether a jury's assessment of

           damages is excessive within the meaning of the law.

             We additionally note that the cap provision of section 2--

           1115.1 forces the successful plaintiff to forgo part of his or her

           jury award without the plaintiff's consent, in clear violation of

           the well-settled principle that a trial court does not have

           authority to reduce a damages award by entry of a remittitur if

           the plaintiff objects or does not consent. See, e.g., Haid, 219 Ill.

           App. 3d at 411. A plaintiff's refusal to consent to remittitur will

           result in the ordering of a new trial. See McCausland v.

           Wonderly, 56 Ill. 410 (1870); Congregation of the Passion, Holy

           Cross Province v. Touche Ross & Co., 224 Ill. App. 3d 559,

           588 (1991). As such, the statutory scheme unduly expands the

           remittitur doctrine. See P. Weiss, Reforming Tort Reform: Is

           There Substance to the Seventh Amendment, 38 Cath. U.L. Rev.

           737, 757 (1989).

             We find persuasive the discussion of legislative remittitur

           contained in an opinion of the Supreme Court of Washington,

           Sofie v. Fireboard Corp., 112 Wash. 2d 636, 771 P.2d 711

           (1989). In that case, the court found unconstitutional

           Washington's statutory limit on noneconomic damages. The

           Sofie court held the statutory damages cap unconstitutional on

           the basis that it violated the plaintiffs' right to a trial by jury, an

           issue we do not determine in the instant case. The court's

           secondary discussion, which considered the plaintiffs' separation

           of powers challenge, is instructive to our separation of powers

           analysis.

             In addressing the plaintiffs' arguments that the statutory

           damages cap operated as a "legislative remittitur" in violation of

           the separation of powers doctrine, the Washington Supreme

           Court observed that the statute "directly changes the outcome of

           a jury determination *** by taking a jury's finding of fact and

           altering it to conform to a predetermined formula." Sofie, 112

           Wash. 2d at 653, 771 P.2d at 720. The court observed that

           remittitur is wholly within the power of the trial judge, and it is

           the judge who is empowered to make the legal conclusion, on

           a case-by-case basis, that the jury's damage award is excessive

           in light of the evidence. Consequently, because the "[l]egislature

           cannot make such case-by-case determinations," separation of

           powers concerns would be violated by the "legislative attempt

           to mandate legal conclusions." Sofie, 112 Wash. 2d at 654, 771

           P.2d at 721. Although the Sofie court did not base its decision

           squarely upon separation of powers concerns, the court

           observed, "[T]he [statutory damages] limit may, indeed, violate

           the separation of powers." Sofie, 112 Wash. 2d at 654, 771 P.2d

           at 721.

             In the case at bar, we conclude that section 2--1115.1

           invades the power of the judiciary to limit excessive awards of

           damages. The courts are constitutionally empowered, and indeed

           obligated, to reduce excessive verdicts where appropriate in light

           of the evidence adduced in a particular case. Section 2--1115.1,

           however, reduces damages by operation of law, without regard

           to the specific circumstances of individual jury awards.

           Although legislative limits upon certain types of damages may

           be permitted, such as damages recoverable in statutory causes

           of action, we hold that the cap in section 2--1115.1 violates the

           separation of powers clause of the Illinois Constitution.

             In summary, we hold that the compensatory damages cap

           of section 2--1115.1 violates the constitutional prohibition

           against special legislation and also violates the separation of

           powers clause. Because we have so determined, we decline to

           address the parties' additional arguments questioning the validity

           of section 2--1115.1 as violating the right to a jury trial and the

           right to a certain remedy under the Illinois Constitution.

           

           III. Section 3.5 of the Joint Tortfeasor Contribution Act

             Plaintiffs challenge the constitutionality of the "contribution

           credit" created by Public Act 89--7. This credit is set forth in a

           new provision, section 3.5(a), which has been added to the Joint

           Tortfeasor Contribution Act (740 ILCS 100/3.5(a) (West 1996)).

           Section 3.5(a) provides:

                      "sec. 3.5. Contribution against the plaintiff's

                          employer.

                      (a) If a tortfeasor brings an action for contribution

                          against the plaintiff's employer, the employer's liability

                          for contribution shall not exceed the amount of the

                          employer's liability to the plaintiff under the Workers'

                          Compensation Act or the Workers' Occupational

                          Diseases Act. The tortfeasor seeking contribution from

                          the plaintiff's employer is not entitled to recover money

                          from the employer. The tortfeasor shall receive a credit

                          against his or her liability to the plaintiff in an amount

                          equal to the amount of contribution, if any, for which

                          the employer is found to be liable to that tortfeasor,

                          even if the amount exceeds the employer's liability

                          under the Workers' Compensation Act or the Workers'

                          Occupational Diseases Act." 740 ILCS 100/3.5(a) (West

                          1996).

             The circuit court held that section 3.5(a) violated the due

           process and equal protection clause of the Illinois Constitution

           (Ill. Const. 1970, art. I, sec. 2), the right to a certain remedy (Ill.

           Const. 1970, art. I, sec. 12), and the separation of powers

           provision (Ill. Const. 1970, art. II, sec. 1). The court concluded

           that the section would deprive an injured party of "full

           compensation due to [its] constitutional infirmities." The court

           also noted that "working mathematically through different

           scenarios demonstrates that illogical and surely unintended

           results occur from [applying the principles of section 3.5(a)]."

             Initially, we note the fundamental inconsistency between

           section 3.5(a) and the amendments made by Public Act 89--7 to

           section 2--1117 of the Code of Civil Procedure (735 ILCS 5/2--

           1117 (West 1996)). The amended version of section 2--1117

           abolishes the doctrine of joint and several liability in all actions

           brought on account of death, bodily injury to person, or physical

           damage to property. The doctrine of joint and several liability

           is replaced in these actions with proportionate several liability,

           whereby a defendant is liable "only for that proportion of

           recoverable economic and non-economic damages, if any, that

           the amount of that defendant's fault, if any, bears to the

           aggregate amount of fault of all other tortfeasors." 735 ILCS

           5/2--1117 (West 1996).[fn5]  At the same time, however,

           section 2(b) of the Contribution Act, which is unaltered by

           Public Act 89--7, provides that "[t]he right of contribution exists

           only in favor of a tortfeasor who has paid more than his pro rata

           share of the common liability." 740 ILCS 100/2(b) (West 1996).

           Thus, because a tortfeasor is only liable for his or her

           proportionate share of damages as defined by section 2--1117,

           it appears that a tortfeasor would never need, or be able, to

           pursue a contribution action against an employer and, therefore,

           that section 3.5(a) could never be given effect. See R. Michael,

           Joint Liability: Should It Be Reformed or Abolished?--The

           Illinois Experience, 27 Loy. U. Chi. L.J. 867, 910 (1996); S.

           O'Neil, A New Day, The Civil Justice Reform Amendments of

           1995, 9 CBA Rec. at 18, 28 (May 1995) ("Contribution claims

           against employers are now technically unnecessary because a

           defendant's liability is limited to his own percentage of fault");

           see also N.M. Stat. Ann. sec. 41--3A--1(E) (Michie 1996)

           (expressly noting that defendants who are subject to

           proportionate several liability are not entitled to contribution);

           Ind. Code Ann. sec. 34--4--33--7 (Michie 1986).

             The legislature's enactment of section 3.5(a) and

           simultaneous adoption of proportionate several liability in

           section 2--1117 raises a serious question as to whether, on the

           basis of this conflict alone, the section 3.5(a) credit must be

           stricken. We need not resolve this issue, however, for even if we

           assume that the two provisions can coexist, we determine that

           section 3.5(a) is invalid.

             The first sentence of section 3.5(a) states that an employer's

           "liability for contribution" is limited to the amount of the

           employer's liability to the plaintiff under the Workers'

           Compensation Act (820 ILCS 305/1 et seq. (West 1996)), or the

           Workers' Occupational Diseases Act (820 ILCS 310/1 et seq.

           (West 1996)). Standing alone, this sentence would be a

           codification of this court's decision in Kotecki v. Cyclops

           Welding Corp., 146 Ill. 2d 155 (1991). However, the next two

           sentences of section 3.5(a) negate the meaning of the first

           sentence. The second sentence of section 3.5(a) states that a

           tortfeasor seeking contribution from an employer may not

           receive money from that employer. The third sentence then

           begins by stating that the tortfeasor, instead of receiving money,

           will receive a credit for the "amount of contribution" for which

           the employer is "found to be liable" to the tortfeasor. This credit

           is to be applied against the tortfeasor's liability to the plaintiff.

             Because the first sentence of section 3.5(a) limits the

           employer's "liability for contribution" to the employer's

           workers' compensation liability, one might reasonably assume

           that the amount of the credit in the third sentence, which is

           defined as being equal to the "amount of contribution" for which

           the employer is "found to be liable," would also be equal to the

           employer's workers' compensation liability. However, this is not

           the case. The final clause of the third sentence unequivocally

           states that the amount of the credit may exceed the employer's

           workers' compensation liability. Thus, section 3.5(a) is not only

           inconsistent with section 2--1117, it is also internally

           inconsistent: if the second and third sentences of section 3.5(a)

           are given effect, the first sentence is rendered meaningless.

             The internal contradiction within section 3.5(a) further

           suggests that a consistent and intelligible construction of the

           provision may not be possible. Again, however, we need not

           decide whether the section 3.5(a) credit must be invalidated on

           this basis alone. Even if the second and third sentences of

           section 3.5(a) are enforced to the exclusion of the first sentence,

           the credit remains invalid.

             Plaintiffs contend that if the section 3.5(a) credit is given

           effect, then an employee's recovery from a third-party tortfeasor

           will be unjustifiably subjected to a "double reduction." Plaintiffs

           maintain that this double reduction will occur because of the

           combined effect of the section 3.5(a) credit and the

           proportionate several liability of section 2--1117. According to

           plaintiffs, the employee's recovery from the third-party

           tortfeasor would first be reduced by the percentage of the

           employer's comparative fault because section 2--1117 makes the

           defendant only severally liable. Then, because the section 3.5(a)

           credit may exceed the employer's workers' compensation

           liability, the employee's recovery would be reduced again by the

           percentage of the employer's fault. Thus, plaintiffs argue that in

           an action by an employee against a third-party tortfeasor, the

           employee will bear the burden of his employer's fault twice. See

           27 Loy. U. Chi. L.J. at 912.

             As an illustration of how the double reduction would occur

           in practice, plaintiffs offer the following examples. Consider an

           action involving an employee plaintiff, an employer, and a third-

           party tortfeasor. Assume that the plaintiff is awarded $500,000

           in damages and that the tortfeasor and the employer are each

           50% at fault. Pursuant to the amended version of section 2--

           1117, the tortfeasor would be liable only for his or her

           proportionate share of the damages, or $250,000. Then, under

           section 3.5(a), the tortfeasor would obtain a credit against his or

           her liability to the plaintiff in an amount equal to the employer's

           proportionate share of the damages, in this case, 50% or

           $250,000. Thus, because $250,000 minus $250,000 equals zero,

           the tortfeasor would incur no liability to the plaintiff.

             A similar situation occurs when the contributory fault of the

           plaintiff and the employer's fault together equals 50% or more.

           Assume the same verdict of $500,000. Further assume that the

           plaintiff's percentage of contributory fault is 10%, the

           tortfeasor's percentage of fault is 50%, and the employer's

           percentage of fault is 40%. The $500,000 verdict would first be

           reduced by the plaintiff's degree of contributory fault. This

           reduction would be 10% of $500,000, or $50,000. The tortfeasor

           is liable for 50% of the verdict, or $250,000, but then gets a

           credit for the amount of liability allocated to the employer (in

           this example, 40%, or $200,000). Thus, the tortfeasor, whose

           percentage of fault is 50%, is liable for only $50,000, or 10%

           of the total damages.

             Plaintiffs argue that in both of the examples above, the

           employee's recovery from the third-party tortfeasor is subjected

           to a double reduction. Plaintiffs maintain that this double

           reduction is arbitrary and discriminatory, and in violation of

           principles of due process and equal protection.

             Defendants do not contend that the double reduction effect

           is constitutional. Instead, defendants assert that the section 3.5(a)

           credit should be construed in a limited fashion so that the

           double reduction will not occur. Specifically, defendants

           maintain that the section 3.5(a) credit should be available only

           in those situations where the third-party tortfeasor settles with

           the plaintiff for an amount greater than his or her proportionate

           share of liability. In these situations, according to defendants,

           the proportionate several liability of section 2--1117 would not

           apply. Thus, the application of the section 3.5(a) credit to the

           settlement amount would not produce a double reduction.

             We do not believe that this construction of section 3.5(a) is

           permitted by the statute. Under section 3.5(a), a third-party

           tortfeasor seeking contribution from an employer may not

           receive money. Instead, the tortfeasor receives a credit which is

           applied against the tortfeasor's "liability to the plaintiff."

           However, once the tortfeasor settles with the plaintiff, the

           tortfeasor is no longer liable for the plaintiff's damages. Thus,

           if the tortfeasor settles, there is no liability to which the credit

           can be applied. Therefore, under the plain language of the

           statute, section 3.5(a) cannot apply to those situations where the

           third-party tortfeasor settles with the plaintiff. See also 27 Loy.

           U. Chi. L.J. at 910 n.257.

             Defendants also assert that, as a practical matter, the double

           reduction will never occur. They point out that under section 2--

           1117, a tortfeasor will never be liable for more than his or her

           proportionate share of the damages and, therefore, will never

           meet the threshold requirement for contribution. See 740 ILCS

           100/2(b) (West 1992). According to defendants, the double

           reduction effect described by plaintiffs is merely a hypothetical

           event which will not happen in practice.

             Defendants are correct to point out that, logically, the

           section 3.5(a) credit cannot exist in the face of the proportionate

           several liability of section 2--1117, but this fact only serves to

           highlight the conflict between the two provisions. Furthermore,

           while defendants' argument that the section 3.5(a) credit will

           never occur resolves the conflict with section 2--1117 and the

           internal contradiction within section 3.5(a), it also renders the

           second and third sentences of section 3.5(a) a complete nullity,

           in violation of well-established principles of statutory

           construction. See, e.g., Kraft, Inc. v. Edgar, 138 Ill. 2d 178, 189

           (1990) ("A statute should be construed so that no word or

           phrase is rendered superfluous or meaningless"); 2A N. Singer,

           Sutherland on Statutory Construction sec. 46.06 (5th ed.

           1993).[fn6]

             Section 3.5(a) was discussed only briefly during the debate

           on House Bill 20 and the comments which were offered provide

           no guidance in resolving the ambiguities of the provision. See

           89th Ill. Gen. Assem., House Proceedings, February 16, 1995,

           at 53-57, 129-30. Accordingly, we conclude that the credit set

           forth in the second and third sentences of section 3.5(a) is either

           arbitrary and unconstitutional, as plaintiffs propose, or entirely

           superfluous, as defendants propose. In either case, the section

           3.5(a) credit is invalid and must be stricken.

           

           IV. The Abolition of Joint and Several Liability

             The common law doctrine of joint and several liability

           provides, in general, that when two or more defendants

           tortiously contribute to the same, indivisible injury, each

           defendant may be held jointly and severally liable for the entire

           injury. See generally 3 F. Harper, F. James & O. Gray, Torts,

           secs. 10.1, 10.2 (2d ed. 1986); W. Keeton, Prosser & Keeton on

           Torts sec. 47, secs. 50 through 52 (5th ed. 1984); Coney v.

           J.L.G. Industries, Inc., 97 Ill. 2d 104, 119-20 (1983).

           Significantly, under this doctrine, the plaintiff may recover

           compensation for the full amount of the injury from any one of

           defendants responsible for the injury. Coney, 97 Ill. 2d at 119-

           20.

             As noted previously, Public Act 89--7 eliminates the

           doctrine of joint and several liability in all actions brought on

           account of death, bodily injury to person, or physical damage to

           property. In amendments made to section 2--1117 of the Code

           of Civil Procedure, Public Act 89--7 replaces joint and several

           liability with proportionate several liability. The amended

           version of section 2--1117 provides in full:

                      "sec. 2--1117. Several liability.

                      (a) In any action brought on account of death, bodily

                          injury to person, or physical damage to property in

                          which recovery is predicated upon fault as defined in

                          Section 2--1116, a defendant is severally liable only and

                          is liable only for that proportion of recoverable

                          economic and non-economic damages, if any, that the

                          amount of that defendant's fault, if any, bears to the

                          aggregate amount of fault of all other tortfeasors, as

                          defined in Section 2--1116, whose fault was a proximate

                          cause of the death, bodily injury, economic loss, or

                          physical damage to property for which recovery is

                          sought.

                      (b) Notwithstanding the provisions of subsection (a),

                          in any healing art malpractice action based on

                          negligence or wrongful death, any defendants found

                          liable shall be jointly and severally liable if the

                          limitations on non-economic damages in Section 2--

                          1115.1 of this Act are for any reason deemed or found

                          to be invalid." 735 ILCS 5/2--1117 (West 1996).

             The circuit court concluded that, with "absolute certainty,"

           section 2--1117 deprives the citizens of Illinois of their right to

           "find a certain remedy in the laws for all injuries and wrongs"

           (Ill. Const. 1970, art. I, sec. 12). The court further determined

           that section 2--1117 " `unreasonably mandates an allocation of

           percentages of negligence to nonparties without any kind of

           procedural safeguard' " (quoting Newville v. State of Montana

           Department of Family Services, 267 Mont. 237, 252, 883 P.2d

           793, 802-03 (1994)) and, hence, violates the constitutional right

           to due process (Ill. Const. 1970, art. I, sec. 2). The circuit court

           also held that section 2--1117 violates the separation of powers

           provision of the Illinois Constitution (Ill. Const. 1970, art. II,

           sec. 1) and the courts provision (Ill. Const. 1970, art. VI, sec.

           1).

             In part III of this opinion, we noted that section 2--1117 is

           fundamentally at odds with the basic principles of the

           Contribution Act and with section 3.5(a). Section 2--1117 also

           directly conflicts with section 4 of the Contribution Act (740

           ILCS 100/4 (West 1996)). Public Act 89--7 amended section 4

           by adding the words "[e]xcept as provided in Section 3.5 of this

           Act." Pub. Act 89--7, eff. March 9, 1995. Section 4 now

           provides:

                      "sec. 4. Rights of Plaintiff Unaffected. Except as

                          provided in Section 3.5 of this Act, a plaintiff's right to

                          recover the full amount of his judgment from any one

                          or more defendants subject to liability in tort for the

                          same injury to person or property, or for wrongful

                          death, is not affected by the provisions of this Act." 740

                          ILCS 100/4 (West 1996).

             Section 4 evidently retains the doctrine of joint and several

           liability because it expressly preserves a plaintiff's right to

           obtain a full recovery of damages from any one or more

           defendants, subject only to section 3.5. See Coney, 97 Ill. 2d at

           123. Yet, at the same time, section 2--1117 unquestionably

           abolishes joint and several liability. See 27 Loy. U. Chi. L.J. at

           910 n.258. The simultaneous adoption and retention of two

           substantive, contradictory doctrines in a single act creates a

           significant obstacle to discerning the legislative intent behind

           Public Act 89--7. Because section 2--1117 and section 4 of the

           Contribution Act are diametrically opposed, any attempt to

           harmonize them would necessarily be futile. Moreover, we

           cannot assume that the retention of section 4 was merely an

           oversight by the legislature because the section itself was

           amended by Public Act 89--7. Hence, the legislature was

           mindful of both section 2--1117 and section 4 at the time Public

           Act 89--7 was passed and was presumptively aware of their

           meanings.

             As with the section 3.5(a) credit, the irreconcilable conflict

           between section 2--1117 and section 4 raises a serious question

           as to whether section 2--1117 can be enforced without

           substantially, and improperly, rewriting Public Act 89--7. See,

           e.g., Kozak v. Retirement Board of the Firemen's Annuity &

           Benefit Fund, 95 Ill. 2d 211, 220 (1983) (statute may not be

           rewritten to make it consistent with the court's view of sound

           public policy). However, we need not resolve this issue. Like

           the section 3.5(a) credit, we believe that even if section 2--1117

           can be considered in isolation, it is invalid.

             Defendants contend that the legislature's adoption of

           proportionate several liability in section 2--1117 is a reasonable

           legislative action, in light of problems which allegedly exist

           with the doctrine of joint and several liability. According to

           defendants, the foremost problem with joint and several liability

           is that it unfairly holds tortfeasors liable for damages which they

           do not cause.[fn7] In an argument dependent upon this

           assertion, defendants also maintain that, under joint and several

           liability, "deep pocket" defendants are improperly forced to bear

           the costs of misconduct caused by others. Defendants assert that

           these costs, which are initially borne by the "deep pocket"

           defendant, are eventually passed on to others in the form of

           higher consumer costs and increased taxes. See also IDC

           Quarterly, at 7 (Second Quarter 1996) (contending that joint and

           several liability inherently gives rise to economic inefficiency

           and that the doctrine creates a "skewing of economic

           incentives"). Defendants maintain that these failings of joint and

           several liability are cured, either partially or fully, by

           proportionate several liability. Therefore, according to

           defendants, the legislature was justified in enacting section 2--

           1117.

             We note that the proposition which defendants offer as the

           primary explanation for abolishing the doctrine of joint and

           several liability, i.e., the assertion that the doctrine requires

           tortfeasors to pay for more damages than they caused, is at odds

           with this court's explanation of joint and several liability in

           Coney, 97 Ill. 2d 104. In Coney, this court was asked to decide,

           inter alia, whether the doctrine of comparative negligence or

           fault necessitated the elimination of joint and several liability.

           Coney, 97 Ill. 2d at 110. The defendant in Coney urged this

           court to abandon joint and several liability, arguing that "[w]ith

           the adoption of comparative negligence where damages are

           apportioned according to each party's fault, *** it is no longer

           rational to hold a defendant liable beyond his share of the total

           damages." Coney, 97 Ill. 2d at 120. The court rejected this

           argument and held that the adoption of comparative negligence

           did not mandate the abolition of joint and several liability. In so

           holding, the Coney court stated:

                      "The feasibility of apportioning fault on a

                          comparative basis does not render an indivisible injury

                          `divisible' for purposes of the joint and several liability

                          rule. A concurrent tortfeasor is liable for the whole of

                          an indivisible injury when his negligence is a proximate

                          cause of that damage. *** The mere fact that it may be

                          possible to assign some percentage figure to the relative

                          culpability of one negligent defendant as compared to

                          another does not in any way suggest that each

                          defendant's negligence is not a proximate cause of the

                          entire indivisible injury." (Emphasis added.) Coney, 97

                          Ill. 2d at 121-22.

           See also Burke v. 12 Rochschild's Liquor Mart, Inc., 148 Ill. 2d

           429, 452-53 (1992) (recognizing that the adoption of

           comparative negligence principles does not alter a joint

           tortfeasor's full responsibility for a plaintiff's single, indivisible

           injury).

             The principle that tortfeasors who are held jointly and

           severally liable are each fully responsible for the entirety of the

           plaintiff's injury has been explained:

               "Joint and several liability only applies to injuries for

                          which the defendant herself is fully responsible. She is

                          responsible for the entirety of some injury only if her

                          tortious behavior was an actual and proximate cause of

                          the entire injury. [Emphasis added.] She is not liable for

                          injuries, including separable portions of injuries, to

                          which she did not contribute. She is not liable unless

                          the tortious aspect of her conduct was an actual cause

                          of the injury. Moreover, even then, she is not liable if,

                          for reasons of policy or principle, her connection to the

                          injury is considered too remote or minimal to be

                          `proximate.'

                      A defendant's individual full responsibility for an

                          injury that was an actual and proximate result of her

                          tortious behavior is not diminished if some other

                          person's tortious behavior also was an actual and

                          proximate cause of the injury. Rather each defendant

                          whose tortious behavior was an actual and proximate

                          cause of the injury is individually fully responsible for

                          the entire injury. This is most obvious when a

                          defendant's tortious behavior was either necessary or

                          independently sufficient for the occurrence of the injury,

                          but it remains true whenever a defendant's tortious

                          behavior was an actual and proximate cause of the

                          injury.

                        * * *

                      [There is a fundamental difference] between each

                          [joint] defendant's individual full responsibility for the

                          damages that she tortiously caused and the comparative

                          responsibility percentages that are obtained by

                          comparing the defendants' individual full

                          responsibilities for the injury. [In situations where two

                          defendants are held jointly and severally liable for

                          negligently injuring a plaintiff] [n]either defendant ***

                          [is] merely `50% negligent' or `50% responsible.' Such

                          statements make as much sense as saying that someone

                          is `50% pregnant.' Nor did either defendant's

                          negligence cause or occasion only 50% of the plaintiff's

                          injury. Rather, each defendant was 100% negligent,

                          each defendant's negligence was an actual and

                          proximate cause of 100% of the injury, and each

                          defendant therefore is fully responsible for the entire

                          injury. Only when we compare their individual full

                          responsibilities, and assume that they were equally

                          negligent, does it make sense to say that each

                          defendant, when compared to the other, bears 50% of

                          the total comparative responsibility for the injury."

                          (Emphasis in original.) R. Wright, The Logic and

                          Fairness of Joint and Several Liability, 23 Memphis St.

                          U.L. Rev. 45, 54-56 (1992).

           See also Restatement (Second) of Torts sec. 875, Comment c,

           at 315 (1979) (under the rules of causation set forth by the

           Restatement, "any one of a number of persons whose tortious

           conduct is a substantial factor in causing harm is liable for the

           harm in the absence of a superseding cause"); Lilly v. Marcal

           Rope & Rigging, Inc., 289 Ill. App. 3d 1105, 1113-16 (1997);

           27 Loy. U. Chi. L.J. at 907-08; 21 U.C. Davis L. Rev. at 1141-

           93.

             This court's reasoning in Coney places into question

           defendants' primary justification for abolishing joint and several

           liability, i.e., that the doctrine requires some defendants to pay

           for more damages than they caused or for which they are

           responsible. We need not resolve, however, the conflict between

           the Coney court's analysis of joint and several liability and

           defendants' justification for abolishing the doctrine. We believe

           that, because of the way in which it is drafted, section 2--1117

           violates the special legislation clause of the Illinois Constitution.

             Section 2--1117 purports to eliminate the doctrine of joint

           and several liability. However, it does not do so completely.

           Paragraph (b) of section 2--1117 automatically reinstates joint

           and several liability for medical malpractice defendants if the

           cap on noneconomic damages in section 2--1115.1 is

           invalidated. Because we have held that the cap on noneconomic

           damages is unconstitutional, section 2--1117(b) has been

           activated.

             The justification for imposing joint and several liability

           upon medical malpractice defendants in the absence of a

           damages cap is not immediately apparent. See J. Zimmerman,

           P. Phillips & J. Bisceglia, A Review of the Illinois Civil Justice

           Reform Act of 1995, 83 Ill. B.J. 282, 285 (1995) ("Neither the

           statutory language preserving joint and several liability in these

           narrow circumstances nor the legislative purpose for doing so

           are clear"). One reason for enacting section 2--1117(b) which

           was given during the debate on House Bill 20 was that section

           2--1117(b) was needed to achieve fairness for plaintiffs bringing

           medical malpractice actions. Representative Cross, in response

           to a question asking whether section 2--1117(b) was intended as

           an exclusive benefit for the medical profession, explained that

           the legislature was "trying to be fair to people that have services

           of ... from [physicians], from nurses, from hospitals, anyone

           associated with the health care industry." 89th Ill. Gen. Assem.,

           House Proceedings, February 16, 1995, at 150 (statements of

           Representative Cross).

              The differences between proportionate several liability and

           joint and several liability can have a significant, practical impact

           upon tort plaintiffs. As one commentator has explained:

                      "If all the tortfeasors are available and solvent, joint

                          and several liability with contribution and proportionate

                          several liability both ultimately achieve the same result:

                          liability is apportioned among the multiple responsible

                          causes according [to] their comparative responsibility.

                          However, two major practical differences exist between

                          joint and several liability and proportionate several

                          liability. Under proportionate several liability, the

                          plaintiff can recover full compensation for his injury

                          only if he locates, sues, and collects from each party

                          who tortiously contributed to his injury. The plaintiff

                          therefore bears a substantial risk of receiving less than

                          full compensation if any tortfeasor is missing, insolvent,

                          or has an expected share of liability that would not be

                          worth the cost of litigation. In addition, the costs in

                          time and dollars of the multiple actions required to

                          obtain theoretically full compensation will substantially

                          delay and reduce the plaintiff's actual net compensation

                          even if all the tortfeasors can be sued successfully.

                          Conversely, under joint and several liability the risk of

                          insolvent or otherwise unavailable tortfeasors and the

                          expense of multiple actions is placed on the solvent

                          tortfeasors, if any, from whom the plaintiff initially

                          obtains compensation. The plaintiff can obtain full

                          compensation in the initial suit, and the tortfeasors who

                          pay the plaintiff must seek contribution or indemnity

                          from the other tortfeasors." U.C. Davis L. Rev. at 1142-

                          43.

           See also Coney, 97 Ill. 2d at 123-24.

             Section 2--1117(b)'s abatement of proportionate several

           liability in the context of medical malpractice arbitrarily benefits

           only medical malpractice plaintiffs. These plaintiffs will not

           have to bring several separate actions to recover full

           compensation for their injuries. Nor will these plaintiffs bear the

           risk of any tortfeasor being insolvent or otherwise unavailable.

           However, other tort plaintiffs, whose injuries are not caused by

           medical malpractice, will face these burdens. Neither the

           plaintiffs nor the defendants in the case at bar have offered any

           explanation as to why a select group of medical malpractice

           plaintiffs should enjoy the practical benefits of joint and several

           liability to the exclusion of all other tort plaintiffs. The

           legislature, of course, may reasonably and justifiably be

           concerned with achieving fairness for tort plaintiffs. But the

           legislature may not adopt an arbitrary means of achieving that

           goal. Grace, 51 Ill. 2d at 485. If, in fact, a real need exists to

           eliminate the harshness of several liability, then logically this

           need exists for all plaintiffs who have suffered physical injury

           or loss of property at the hands of joint tortfeasors, and not just

           medical malpractice plaintiffs. The stated legislative goal of

           achieving fairness does not justify singling out a select group of

           tort plaintiffs for special treatment. Therefore, we conclude that

           section 2--1117(b) arbitrarily and unconstitutionally provides a

           special benefit for medical malpractice plaintiffs. See generally

           Grasse, 412 Ill. 179.

             We further note that section 2--1117(b) contradicts the

           stated purpose for enacting proportionate several liability. The

           preamble to Public Act 89--7 declares that "it is the public

           policy of this State that a defendant should not be liable for

           damages in excess of its proportional share of fault." Plaintiffs

           and defendants both agree that this policy was the basis for the

           adoption of proportionate several liability in section 2--

           1117(a).[fn8] Section 2--1117(b) inexplicably contradicts this

           rationale. If the premise underlying Public Act 89--7's abolition

           of joint and several liability is that the doctrine unfairly permits

           a plaintiff to recover more in damages than is justified from an

           individual defendant then, logically, that unfairness is only

           exacerbated if there is no cap on the total amount of the

           damages which the plaintiff can recover. Thus, the invalidation

           of the cap on noneconomic damages does not justify or explain

           the exemption provided by 2--1117(b) from the general rule of

           several liability.

             In sum, there is no discernable rational basis for treating

           medical malpractice plaintiffs differently from other plaintiffs in

           death, bodily injury and property damage cases. Moreover,

           treating these plaintiffs differently in the absence of a damages

           cap is directly contrary to the legislature's acknowledged

           purpose for enacting proportionate several liability. The

           proscription against special legislation prevents the legislature

           from preferentially and arbitrarily discriminating in favor of a

           select group. Village of Vernon Hills, 168 Ill. 2d at 122.

           Accordingly, we conclude that section 2--1117(b) violates the

           special legislation clause of the Illinois Constitution.

             Plaintiffs contend that section 2--1117(b) cannot be severed

           from section 2--1117(a) and, therefore, that if section 2--1117(b)

           is invalid then all of section 2--1117 must be stricken. For the

           reasons stated more fully in part VI of this opinion, we agree

           that without section 2--1117(b), the remainder of section 2--

           1117 no longer reflects the legislature's intentions regarding the

           scope and nature of its enactment of proportionate several

           liability. See, e.g., Lee v. Retirement Board of the Policeman's

           Annuity & Benefit Fund, 31 Ill. 2d 252 (1964). Therefore, we

           hold that section 2--1117(b) cannot be severed from section 2--

           1117(a) and that the entirety of section 2--1117 is

           unconstitutional.

           

           

           V. Constitutionality of the Physician-Patient Disclosure Rules

             We next consider the constitutionality of certain provisions

           of Public Act 89--7 that significantly alter existing discovery

           practice in Illinois. Section 2--1003(a) of the Act imposes a

           mandatory consent requirement by which every patient who files

           a personal injury lawsuit is deemed to agree to the unlimited

           disclosure of his or her medical history, records, and other

           medical information to any party who has appeared in the action

           and who requests such information. 735 ILCS 5/2--1003(a)

           (West 1996). Section 2--1003, which is entitled "Discovery and

           depositions" sets forth the disclosure requirements in

           detail.[fn9] If the plaintiff fails to supply the requested consent

           form within 28 days, the court is required, upon motion of a

           defendant, to compel the plaintiff's compliance or to issue an

           order of involuntary dismissal of the plaintiff's action. The

           mandatory consent of section 2--1003 operates as a waiver of

           any privilege between the injured person and each health care

           provider who has furnished care at any time. The consent or

           waiver extends to ex parte conferences between the plaintiff's

           treating physicians or other health care personnel and the

           defendant and his or her representatives. As such, section 2--

           1003(a) is directly contrary to what has been referred to as the

           "Petrillo doctrine," which prohibits defendants and their

           attorneys from engaging in ex parte discussions with the injured

           plaintiff's treating physicians. Petrillo v. Syntex Laboratories,

           Inc., 148 Ill. App. 3d 581 (1986).

             We note that the prior version of section 2--1003 consisted

           of five paragraphs, the first of which provided in its entirety:

           "Discovery, admissions of fact and of genuineness of documents

           and answers to interrogatories shall be in accordance with

           rules." 735 ILCS 5/2--1003(a) (West 1992). This provision has

           been retained as subsection (a--1) of the amended statute and the

           remaining provisions of the prior statute have also been retained.

           Public Act 89--7 adds a new subsection to the discovery and

           depositions statute, which provides in its entirety:

                      "(a) Any party who by pleading alleges any claim for

                          bodily injury or disease, including mental health injury

                          or disease, shall be deemed to waive any privilege

                          between the injured person and each health care

                          provider who has furnished care at any time to the

                          injured person. `Health care provider' means any person

                          or entity who delivers or has delivered health care

                          services, including diagnostic services, and includes, but

                          is not limited to, physicians, psychologists,

                          chiropractors, nurses, mental health workers, therapists,

                          and other healing art practitioners. Any party alleging

                          any such claim for bodily or mental health injury or

                          disease shall, upon written request of any other party

                          who has appeared in the action, sign and deliver within

                          28 days to the requesting party a separate Consent

                          authorizing each person or entity who has provided

                          health care at any time to the allegedly injured person

                          to:

                        (1) furnish the requesting party or the party's

                                 attorney a complete copy of the chart or record of

                                 health care in the possession of the provider,

                                 including reports sent to any third party, including

                                 any records generated by other health care providers

                                 and in the possession of the health care provider, and

                                 including radiographic films of any type;

                        (2) permit the requesting party or the party's

                                 attorney to inspect the original chart or record of

                                 health care during regular business hours and at the

                                 regular business location of the health care provider,

                                 upon written request made not less than 7 days prior

                                 to the inspection;

                        (3) accept and consider charts and other records of

                                 health care by others, radiographic films, and

                                 documents, including reports, deposition transcripts,

                                 and letters, furnished to the health care provider by

                                 the requesting party or the party's attorney, before

                                 giving testimony in any deposition or trial or other

                                 hearing;

                        (4) confer with the requesting party's attorney

                                 before giving testimony in any deposition or trial or

                                 other hearing and engage in discussion with the

                                 attorney on the subjects of the health care provider's

                                 observations related to the allegedly injured party's

                                 health, including the following: the patient history,

                                 whether charted or otherwise recorded or not; the

                                 health care provider's opinions related to the patient's

                                 state of health, prognosis, etiology, or cause of the

                                 patient's state of health at any time, and the nature

                                 and quality of care by other health care providers,

                                 including whether any standard of care was or was

                                 not breached; and the testimony the health care

                                 provider would give in response to any point of

                                 interrogation, and the education, experience, and

                                 qualifications of the health care provider.

                      The form of the Consent furnished pursuant to this

                          subsection (a) shall recite that it is signed and delivered

                          under the authority of this subsection. Any variation in

                          the form of the Consent required by any health care

                          provider, not subject to the jurisdiction of the circuit

                          court before which the action is pending, to whom a

                          request is directed under subdivision (1) or (2) of this

                          subsection (a) shall be accepted by the allegedly injured

                          party and the revised form requested by the health care

                          provider shall be signed and delivered to the requesting

                          party within 28 days after it is tendered for signature.

                      All documents and information obtained pursuant to

                          a Consent shall be considered confidential. Disclosure

                          may be made only to the parties to the action, their

                          attorneys, their insurers' representatives, and witnesses

                          and consultants whose testimony concerns medical

                          treatment prognosis, or rehabilitation, including expert

                          witnesses.

                      A request for a Consent under this subsection (a) does

                          not preclude such subsequent requests as may

                          reasonably be made seeking to expand the scope of an

                          earlier Consent which was limited to less than all the

                          authority permitted by subdivisions (1) through (4) of

                          this subsection (a) or seeking additional Consents for

                          other health care providers.

                      The provisions of this subsection (a) do not restrict

                          the right of any party to discovery pursuant to rule.

                      Should a plaintiff refuse to timely comply with a

                          request for signature and delivery of a consent permitted

                          by this subsection (a) the court, on motion, shall issue

                          an order authorizing disclosure to the party or parties

                          requesting said consent of all records and information

                          mentioned herein or order the cause dismissed pursuant

                          to Section 2--619(a)(9)." 735 ILCS 5/2--1003(a) (West

                          1996).

             In the case at bar, plaintiffs challenged the medical

           disclosure requirements in the circuit court on several grounds,

           arguing that section 2--1003(a) violates separation of powers,

           the right to privacy, the right to certain remedy and access to

           the courts, and the prohibition against special legislation. The

           circuit court ruled that section 2--1003(a) and the corollary

           provisions of Public Act 89--7 unduly encroach on the authority

           of the judiciary and conflict with present supreme court rules.

           The court also held that the provisions violate the "fundamental

           right to privacy and access to the courts enjoyed by the citizens

           of this state," and that there was not "a rational basis for

           requiring a citizen to reveal medical conditions unrelated to the

           litigation in which she is engaged." The circuit court further

           observed that mandating plaintiffs' consent to unlimited

           disclosure of confidential medical information unrelated to the

           injury on which the lawsuit was brought would "likely force

           many persons to avoid the courthouse to redress their wrongs."

           The circuit court specifically upheld "Petrillo [as] well-reasoned

           law which protects the rights outlined above" and concluded that

           the "usual discovery procedures and the Supreme Court rules

           together" provide defendants with adequate opportunity to test

           plaintiffs' allegations.

             This court has declared section 2--1003(a) unconstitutional

           in Kunkel v. Walton, No. 81176 (November 20, 1997), a case

           which, we note, was under advisement at the same time as the

           case at bar. The parties incorporate by reference the arguments

           made in Kunkel, which include several amici curiae briefs filed

           on behalf of defendants. We have reviewed all of the briefs filed

           in this court which relate to the constitutionality of section 2--

           1003(a). Of the various constitutional challenges made to this

           provision, we resolve its constitutionality primarily upon the

           separation of powers doctrine. We also consider plaintiffs'

           argument that the Illinois Constitution of 1970 grants a privacy

           interest to the citizens of this state and, as part of that analysis,

           we examine the reasoning of the appellate court in Petrillo.

           

               A. Separation of Powers

             As we have noted elsewhere in this opinion, the separation

           of powers clause of the Illinois Constitution provides that each

           branch of government is separate and may not exercise the

           powers of another branch. Ill. Const. 1970, art. II, sec. 1; People

           v. Warren, 173 Ill. 2d 348 (1996); Murneigh v. Gainer, 177 Ill.

           2d 287. The judicial power is vested in the supreme court, the

           appellate court, and the circuit courts. Ill. Const. 1970, art. VI,

           sec. 1. In addition, the judicial article of the constitution vests

           this court with supervisory and rulemaking authority over the

           judicial system of Illinois. See Ill. Const. 1970, art. VI, sec. 16.

           It is the constitutional duty of this court to preserve the integrity

           and independence of the judiciary and to protect the judicial

           power from encroachment by the other branches of government.

           People v. Davis, 93 Ill. 2d 155, 161 (1982). See also People v.

           Joseph, 113 Ill. 2d 36 (1986); People v. Flores, 104 Ill. 2d 40,

           49 (1984).

             In the case at bar, plaintiffs maintain that section 2--1003(a)

           violates the separation of powers clause because the statute

           abrogates the judiciary's inherent authority to restrict discovery

           to relevant information and to provide appropriate sanctions for

           discovery abuses. Specifically, section 2--1003(a) provides that

           the circuit court "shall issue an order authorizing disclosure to

           the party or parties requesting said consent of all records and

           information mentioned herein or order the cause dismissed

           pursuant to Section 2--619(a)(9)." (Emphasis added.) 735 ILCS

           5/2--1003(a) (West 1996). Plaintiffs contend that this mandatory

           directive upon the circuit courts unduly infringes upon the

           powers of the judiciary because it not only undercuts the

           inherent authority of the courts in the exercise of judicial

           functions but also directly conflicts with certain discovery rules

           of this court.

             Defendants maintain that the challenged provision serves the

           important societal function of expediting discovery and

           curtailing potential abuses of the discovery process by

           unscrupulous plaintiffs or attorneys who do not disclose all facts

           necessary for defendants to prepare a defense. Defendants

           further observe that this court has often recognized the

           legislature's power to regulate practice and procedure. See, e.g.,

           People v. Walker, 119 Ill. 2d 465 (1988); DeLuna v. St.

           Elizabeth's Hospital, 147 Ill. 2d 57 (1992). According to

           defendants, there is no conflict between section 2--1003(a) and

           the rules of this court which pertain to discovery procedures.

           Defendants contend that the circuit courts remain free to issue

           protective orders or discovery sanctions as needed to curtail

           abuses of the discovery process.

             We agree with plaintiffs that section 2--1003(a) creates an

           irreconcilable conflict with the inherent authority of the

           judiciary. Although we acknowledge that the legislature may, in

           some instances, share concurrent power with this court to

           prescribe procedural rules governing discovery (see, e.g.,

           O'Connell v. St. Francis Hospital, 112 Ill. 2d 273, 281 (1986);

           Niven v. Siqueira, 109 Ill. 2d 357, 368 (1985)), "we have not

           hesitated to strike down those procedural legislative enactments

           which unduly infringe upon our constitutional rule-making

           authority" to regulate the judicial system of Illinois. O'Connell

           v. St. Francis Hospital, 112 Ill. 2d 273, 281 (1986).

             In O'Connell, this court reaffirmed the established principle

           that where a statutory procedure conflicts with a rule of this

           court relating to the same procedure, the rule necessarily

           prevails. This court held that provisions of the Code of Civil

           Procedure which permitted plaintiffs to nonsuit their actions and

           then to commence a new action within a year following such

           dismissal unduly infringed upon the judiciary's powers, to the

           extent that the procedures allowed a plaintiff to avoid

           compliance with Supreme Court Rule 103(b) (134 Ill. 2d R.

           103(b)). Rule 103(b) requires reasonable diligence in the service

           of process and specifies the consequences which result from a

           plaintiff's untimely service of process, either before or after the

           expiration of the statute of limitations. Because the statutory

           provisions under review in O'Connell gave the plaintiff an

           unconditional right to take a voluntary dismissal and to refile

           within a year of such dismissal, without regard to the expiration

           of the limitations period and without regard to the diligence

           provision of Rule 103(b), this court held that the statutes

           impermissibly conflicted with the rule.

             In Gibellina v. Handley, 127 Ill. 2d 122 (1989), this court

           reaffirmed its authority to manage the court system by

           prohibiting an abuse of certain procedures, even though the

           statutes in issue did not directly conflict with a supreme court

           rule. The Gibellina court prospectively limited plaintiffs'

           statutory right to dismiss their actions and refile within one year,

           where, prior to the plaintiff's motion for voluntary dismissal, the

           defendants filed a motion for summary judgment. This court

           determined that a plaintiff should not be permitted to abuse the

           statutory right to refile a nonsuited action within a year where

           a defendant files a motion that would dispose of the lawsuit on

           the merits. Accordingly, the Gibellina court upheld its authority

           to manage the court system of Illinois and to cure an abusive

           use of civil procedures which had burdened the courts and

           infringed upon the judiciary's ability to discharge its duties

           fairly and expeditiously.

             In a different context, this court has reaffirmed the inherent

           power of the judiciary to exercise certain judicial functions, such

           as the power of contempt, without being bound by legislative

           regulation of such power. In Murneigh, 177 Ill. 2d 287, a

           statutory and administrative blood-collection scheme provided

           that judges "shall" enter orders requiring incarcerated sex

           offenders to give blood specimens. The scheme further required

           the courts to punish the violation of such compliance orders as

           contempt of court. We ruled that the provisions in issue violated

           separation of powers principles by conscripting the judiciary into

           the service of an essentially administrative function and by

           mandating the courts to enter contempt sanctions. Murneigh, 177

           Ill. 2d at 313. This in turn intruded upon the judiciary's inherent

           and essential power of contempt, a power held exclusively by

           the judiciary. See also Agran v. Checker Taxi Co., 412 Ill. 145

           (1952); Wright, 63 Ill. 2d 313.

             In the case at bar, as in Murneigh, the challenged legislation

           provides that the courts shall enter an order of compliance and

           further prescribes the sole sanction to be imposed if compliance

           is not met. Section 2--1003(a) directs that if a plaintiff fails to

           furnish the requested consent form within 28 days, "the court,

           on motion, shall issue an order authorizing disclosure to the

           party or parties requesting said consent of all records and

           information mentioned herein or order the case dismissed

           pursuant to section 2--619(a)(9)." The language of this section

           is mandatory rather than permissive. Therefore, section 2--

           1003(a) obligates the courts of this state to become party to the

           forced disclosure of confidential medical information even if

           such material is wholly unrelated to the lawsuit in issue, or, if

           the plaintiff refuses to comply, to enter an order of involuntary

           dismissal.

             Because involuntary dismissals are considered to be

           adjudications on the merits (134 Ill. 2d R. 273), a plaintiff

           injured through the fault of another would lose his or her right

           of action as the penalty for not consenting to the blanket

           disclosure of all confidential medical information, irrespective

           of how irrelevant to the lawsuit and however personal, sensitive,

           or embarrassing the confidential medical information may be to

           the plaintiff.

             Defendants rely on cases in which this court has upheld as

           constitutional certain legislative regulations of procedure and the

           filing of claims. For example, in People v. Williams, 124 Ill. 2d

           300 (1988), this court held that a statute which provided for the

           substitution of judges did not unduly encroach on the powers of

           the judiciary. Similarly, defendants assert, this court has upheld

           statutes requiring the filing of certain materials as a prerequisite

           for obtaining judicial relief. See DeLuna v. St. Elizabeth's

           Hospital, 147 Ill. 2d 57 (1992) (requiring health care provider's

           affidavit certifying that plaintiff's medical malpractice claim had

           merit); People ex rel. County Collector v. Jeri, Ltd., 40 Ill. 2d

           293 (1968) (requiring that a transcript of evidence relating to the

           trial court's findings be attached to the order of tax deed).

             We believe that the particular statutes upheld by this court

           in the above-cited cases withstood constitutional scrutiny for

           reasons not present in the instant case. In Williams, the

           provision allowing for a substitution of judges in certain

           instances caused only a minimal encroachment upon judicial

           authority and did not prevent the courts from deciding cases or

           managing their dockets. In Jeri, the requirement that a transcript

           of evidence be attached to the order for tax deed was part of a

           purely statutory proceeding and its purpose was to safeguard

           against fraud. The challenged provision did not impede the

           courts in the performance of their functions and therefore did

           not violate separation of powers principles. In DeLuna, the

           certificate of merit requirement was found, inter alia, to be

           reasonably related to the legislative goal of discouraging the

           filing of frivolous medical malpractice actions by imposing the

           threshold requirement that a plaintiff obtain an expert medical

           opinion that his or her claim had merit. DeLuna, 147 Ill. 2d at

           75. Unlike the mandatory consent and disclosure requirements

           of section 2--1003(a), the medical malpractice certificate of

           merit requirement upheld in DeLuna may be viewed as directly

           relevant, and explicitly tailored, to the plaintiff's cause of action.

           The certificate of merit requirement did not extend to medical

           information or expert opinion relating to health conditions of the

           plaintiff which were unrelated to the subject matter of the

           medical malpractice complaint. We conclude that the cases cited

           by defendants are distinguishable from the circumstances of the

           case at bar and are therefore inapposite.

             Evaluating the relevance of discovery requests and limiting

           such requests to prevent abuse or harassment are, we believe,

           uniquely judicial functions. Similarly, the court's imposition of

           sanctions for a party's failure to comply with legitimate

           discovery requests in a timely fashion is an inherently judicial

           power. However, nothing in the express terms of section 2--

           1003(a) authorizes the circuit courts to assess the relevance of

           discovery or limit the scope of the defendant's demand for

           unlimited disclosure of all medical information in the possession

           of anyone who provided health care to the plaintiff at any time.

           To the extent that a statute unduly interferes with the exercise

           of inherently judicial functions or powers, the statute cannot

           prevail. See Gibellina, 127 Ill. 2d 122. We believe that section

           2--1003(a) impermissibly interferes with the inherently judicial

           authority to manage the orderly discovery of information

           relevant to specific cases. Therefore, the statute violates the

           separation of powers clause of the Illinois Constitution.

             The judicial authority to limit discovery requests and to

           impose sanctions for discovery violations is, moreover, expressly

           embodied in the discovery rules of this court. Supreme Court

           Rule 201(a) contains the general statement that "[i]nformation

           is obtainable as provided in these rules." 166 Ill. 2d R. 201(a).

           The requirement that discovery requests be relevant to the

           subject matter of the litigation is specified in Rule 201(b) (166

           Ill. 2d R. 201(b)). Rule 201(c)(1) prescribes the procedures for

           obtaining protective orders as a means of preventing abuse. 166

           Ill. 2d R. 201(c)(1). In addition, Rule 219 provides the circuit

           courts with a range of options for imposing sanctions for a

           party's failure to comply with the discovery rules of this court

           or with orders of the circuit court pertaining to discovery. 166

           Ill. 2d R. 219.

             Rule 201(b)(1) provides, "Except as provided in these rules,

           a party may obtain by discovery full disclosure regarding any

           matter relevant to the subject matter involved in the pending

           action ***." (Emphasis added.) 166 Ill. 2d R. 201(b)(1). This

           rule expressly limits a party's right of "full disclosure" to

           matters which are relevant to the subject matter of the pending

           lawsuit. In contrast, section 2--1003(a) omits any mention of

           relevance in the consent requirements. Indeed, the statute

           contemplates maximum disclosure of confidential medical

           information, without regard to whether the information is

           relevant to the particular injuries upon which the plaintiff's

           lawsuit is based. The statute provides that a plaintiff must waive

           "any privilege between the injured person and each health care

           provider who has furnished care at any time to the injured

           person." (Emphasis added.) 735 ILCS 5/2--1003(a) (West 1996).

           The unlimited scope of defendants' discovery in section 2--

           1003(a) therefore creates a direct conflict with Rule 201(b),

           which embodies an express rule of relevance regarding matters

           obtainable through discovery. Such conflict is resolved in favor

           of the rule of this court. See, e.g., O'Connell, 112 Ill. 2d 273.

             For similar reasons, we hold that section 2--1003(a)

           conflicts with Supreme Court Rule 201(c)(1), which governs the

           issuance of protective orders. Rule 201(c)(1) provides: "The

           court may at any time on its own initiative, or on motion of any

           party or witness, make a protective order as justice requires,

           denying, limiting, conditioning, or regulating discovery to

           prevent unreasonable annoyance, expense, embarrassment,

           disadvantage, or oppression." 166 Ill. 2d R. 201. In contrast,

           section 2--1003(a) fails to provide any means by which the

           circuit court may deny a disclosure request or narrow the scope

           of the consent. By its terms, therefore, the statute does not

           permit the circuit court to issue a protective order. Therefore,

           the statute conflicts with Rule 201(c)(1).

             Section 2--1003(a) also fails to explicitly accommodate or

           recognize the judge's discretion to impose a discovery sanction

           other than a dismissal on the merits if the plaintiff fails to

           comply with the consent requirement. Supreme Court Rule 219

           enumerates a range of noninclusive sanctions to address

           discovery violations and abuses, including the award of

           expenses, the barring of a witness, the suppression of otherwise

           discoverable information as a sanction for abuse, the striking of

           any or all pleadings relating to an issue, and other options for

           the circuit court to choose in the exercise of its sound discretion.

           Because section 2--1003(a) directs the circuit court's selection

           of just one sanction for a plaintiff's noncompliance with the

           consent request--involuntary dismissal--the statute conflicts with

           Rule 219 as well as the previously discussed provisions of Rule

           201. Accordingly, we conclude that section 2--1003(a) violates

           the separation of powers clause of the Illinois Constitution

           because the statute directly conflicts with the discovery

           procedures that have been expressly promulgated as rules of this

           court pursuant to its constitutional rulemaking authority.

             Defendants insist that nothing in section 2--1003(a)

           precludes a plaintiff from filing, and the circuit court from

           granting, a protective order pursuant to Supreme Court Rule

           201(c). In fact, during oral argument of Kunkel v. Walton, No.

           81176, attorneys for the defendants and for the Attorney

           General, as intervenor, contended that circuit court judges

           remain free to enter protective orders and to enter sanctions

           other than dismissal, despite the fact that such measures are not

           included within the express terms of section 2--1003(a). The

           defendants contend that section 2--1003(a) does not conflict with

           this court's rules and may be construed in a constitutional

           manner. For the reasons stated below, however, we believe that

           the defendants' proposed construction of section 2--1003(a) is

           inconsistent with the plain terms and intent of the mandatory

           consent and disclosure requirements, and we therefore reject as

           untenable the defendants' attempt to harmonize section 2--

           1003(a) with this court's rules. We further determine that the

           defendants' proposed construction of the statute does not cure

           the separation of powers violation created by the application of

           the statute.

             To evaluate the defendants' statutory construction argument,

           we again look to the specific language in the statute and the

           reasonable inferences that may be drawn therefrom. As we have

           already determined, the plain terms of the statute do not

           encompass any explicit procedures by which a plaintiff may

           object to the request for unlimited consent to the disclosure of

           confidential medical information. Nor does the statute refer to

           the court's authority to enter protective orders to prevent

           discovery abuses under Rule 201(c)(1), or to enter any sanctions

           other than dismissal of a plaintiff's action. Accordingly, we

           conclude that under a "plain terms" construction of section 2--

           1003(a), the statute cannot reasonably be construed as allowing

           the circuit court to limit the scope of a consent request through

           protective orders. In light of the express requirements of the

           statute, the circuit court is not permitted to impose a sanction

           for noncompliance other than dismissal of the plaintiff's cause

           of action.

             The defendants nonetheless argue that the statute may be

           construed to permit the circuit court judges to retain discretion

           over the scope of the discovery because of the following

           sentence in section 2--1003(a): "The provisions of this

           subsection (a) do not restrict the right of any party to discovery

           pursuant to rule."[fn10]

             In our view, this sentence does not support the defendants'

           argument that section 2--1003(a) may be construed as permitting

           the circuit court to enter protective orders and to impose

           discretionary sanctions for noncompliance. The quoted sentence

           does not incorporate any limits or rules that might narrow the

           scope of the consent requirements of the statute. Instead, the

           quoted sentence refers to a party's general right to obtain

           discovery pursuant to this court's rules. To read in limiting

           language which is not expressly included in the framework of

           section 2--1003(a) is to create a contradiction within the statute

           itself. For example, if a plaintiff sought a protective order

           requesting the court to prohibit defense counsel from engaging

           in ex parte conferences with the plaintiff's treating physician,

           the court would be required to either (1) ignore the express

           language of the statute or (2) determine that, because of the

           sentence quoted above, the court retained discretion to determine

           that an ex parte conference was an abuse of discovery. The

           dilemma facing such a court is obvious: the court must apply

           the statute as written, or else adopt an expansive interpretation

           that would defeat the essential purpose and express language of

           the statute. Allowing courts to freely limit the scope of the

           mandatory consent requirement would thwart the legislative

           intent to permit the broadest possible disclosure of medical

           information and to authorize unlimited ex parte conferences with

           the plaintiff's treating health care practitioners. Therefore, we

           reject the defendants' statutory construction analysis as contrary

           to the plain terms and intent of the provision.

             But even if we were to accept the statutory construction

           proposed by the defendants, there is a remaining flaw in the

           analysis which underscores the separation of powers concerns

           previously identified. A discovery procedure which authorizes

           unlimited disclosure of information in the first instance, subject

           only to particularized protective orders, shifts a significant

           burden to the courts of this state to repeatedly assess and limit,

           through entry of protective orders, discovery requests that may

           well be overbroad on their face. The expansive impact of the

           statutory consent requirements virtually demands that plaintiffs'

           attorneys file motions for protective orders as a matter of course

           whenever a consent form is requested by defense counsel.

           Although the judiciary is the proper entity to determine the need

           for protective orders, on a case-by-case basis, one of the effects

           of section 2--1003(a) is to create an assembly line of overbroad

           discovery requests followed by motions for protective orders.

           We believe, therefore, that section 2--1003(a) impermissibly

           burdens and significantly infringes upon the inherent judicial

           powers that are constitutionally granted to the courts. See, e.g.,

           Murneigh, 177 Ill. 2d 287 (rejecting legislative mandate that the

           contempt power be used to facilitate administrative or executive

           scheme); People v. Joseph, 113 Ill. 2d 36 (1986) (striking

           statute requiring all post-conviction proceedings to be conducted

           by judge who was not involved in original proceeding as

           encroaching upon court administration); People v. Flores, 104

           Ill. 2d 40, 49 (1984) (invalidating statute which interfered with

           the ability of a trial judge to control his own docket after the

           trial of a cause had begun); see also Gibellina, 127 Ill. 2d 122.

           It is the duty of this court to invalidate legislation that

           significantly burdens or otherwise curtails the inherent and

           constitutionally granted authority of the judiciary. See Davis, 93

           Ill. 2d at 161. Accordingly, we hold that section 2--1003(a) is

           invalid as violating the separation of powers clause of the

           Illinois Constitution.

           

           B. Right to Privacy and The Petrillo Doctrine

             We next consider plaintiffs' argument that section 2--

           1003(a) violates the privacy rights of Illinois citizens. In support

           of this argument, plaintiffs cite to the two clauses in the Illinois

           Constitution which expressly refer to privacy. See Ill. Const.

           1970, art. I, secs. 6, 12. They further ground their privacy

           argument in the Petrillo doctrine, which recognized a strong

           public policy in preserving the confidential and fiduciary

           physician-patient relationship and held that such public policy

           is violated by ex parte communications between defendants or

           their counsel and plaintiffs' treating physicians.

             Defendants counter that there is no constitutional right to

           privacy in medical information under federal or state decisions.

           Furthermore, the defendants argue, the branch of government

           charged with declaring the public policy of this state is the

           legislature. According to defendants, the legislature acted well

           within its authority in providing for ex parte conferences

           between the plaintiff's health care practitioners and

           representatives of the defendants. Finally, defendants posit that

           the Petrillo doctrine was never expressly adopted by this court

           and that the legislature is free to overturn it.

              In 1970, the Illinois Constitution was amended to include

           two separate provisions which expressly refer to a citizen's

           expectations of privacy. Section 12 of the Illinois Constitution's

           Bill of Rights provides that "[e]very person shall find a certain

           remedy in the laws for all injuries and wrongs which he receives

           to his person, privacy, property or reputation. He shall obtain

           justice by law, freely, completely, and promptly." (Emphasis

           added.) Ill. Const. 1970, art. I, sec. 12. Section 6 of the Illinois

           Bill of Rights states, "The people shall have the right to be

           secure in their persons, houses, papers and other possessions

           against unreasonable *** invasions of privacy ***." Ill. Const.

           1970, art. I, sec. 6.[fn11]

             The Constitutional Commentary to section 6 of the Bill of

           Rights explains that "[t]he protection against `invasion of

           privacy' is new and is stated broadly" and "expands upon the

           individual rights which were contained in Section 6 of Article

           II of the 1870 Constitution and the guarantees of the Fourth and

           Fourteenth Amendments to the United States Constitution." Ill.

           Ann. Stat., 1970 Const., art. I, sec. 6, Constitutional

           Commentary, at 522 (Smith-Hurd 1997). With reference to

           section 6, this court has observed that "[b]ecause the Illinois

           Constitution recognizes a zone of privacy, the protections

           afforded by the Illinois Constitution go beyond the guarantees

           of the Federal Constitution. In re May 1991 Will County Grand

           Jury (1992), 152 Ill. 2d 381." King v. Ryan, 153 Ill. 2d 449, 464

           (1992); see also Fink v. Ryan, 174 Ill. 2d 302 (1996); cf. People

           v. DiGuida, 152 Ill. 2d 104, 119 (1992) (referring to a 1984

           decision in which this court indicated it would interpret section

           6 of the Illinois Bill of Rights as consistent with its counterpart,

           the fourth amendment to the federal constitution). This court has

           stated that governmental conduct or "state action" must be

           present before a citizen claiming a violation of the privacy right

           referenced in section 6 of the Illinois Bill of Rights may obtain

           relief. See Barr v. Kelso-Burnett Co., 106 Ill. 2d 520, 526

           (1985) (rejecting plaintiff's argument that employer's alleged

           violation of free speech, equal protection, due process, and

           privacy rights provided a proper foundation on which to premise

           plaintiff's action for retaliatory discharge); see also People v.

           DiGuida, 152 Ill. 2d at 121-24 (rejecting defendant's free speech

           and free elections challenge as a means to challenge his

           conviction for criminal trespass to private store owner's land).

             In considering section 6 of the Illinois Bill of Rights in

           conjunction with section 12, this court has stated that the

           "constitutional right to be free from governmental invasions of

           privacy [in section 6] is supplemented by the constitutional right

           to a certain remedy for invasions or injuries to one's privacy

           provided for in article I, section 12, of the Illinois Constitution

           of 1970." In re A Minor, 149 Ill. 2d 247, 256 (1992). In Minor,

           a news organization attending a juvenile court hearing sought

           permission to disclose the names of the minor victims of abuse.

           Pursuant to a provision of the Juvenile Court Act, the circuit

           court prohibited the newspaper from disclosing the identities of

           the minor victims. The newspaper appealed. This court affirmed,

           holding that the statutory provision which permitted the news

           media to attend hearings closed to the general public did not

           grant the media a right to disclose the minor victims' names.

           This court held that the circuit court's order barring disclosure

           of the victims' identities was not an unconstitutional prior

           restraint on the freedom of the press. Minor, 149 Ill. 2d at 253-

           57. After citing the two privacy clauses of the Illinois

           Constitution, the court determined that the minor victims had a

           compelling privacy interest at stake. Minor, 149 Ill. 2d at 255.

           In reviewing the history of section 12 of the Illinois Bill of

           Rights, the Minor court held it does not require the presence of

           state action. The court concluded,

               "It is clear from the debates in the Sixth Illinois

                          Constitutional Convention that article I, section 12, was

                          intended to protect an individual's privacy from

                          invasions or injuries caused by another nongovernmental

                          individual or company. 3 Record of Proceedings, Sixth

                          Illinois Constitutional Convention 1531-32." (Emphasis

                          in original.) Minor, 149 Ill. 2d at 256 . 

             Consistent with this court's holding in the Minor case, we

           recognize that section 12 of the Illinois Constitution, unlike

           section 6, does not require state action before its protections are

           activated. However, the precise nature and scope of the privacy

           interest set forth in section 12 has not been the subject of much

           case law in this state. Plaintiffs cite cases in which a

           constitutional right to privacy was found in bank records

           (People v. Jackson, 116 Ill. App. 3d 430, 434-35 (1983)) and

           telephone records (People v. DeLaire, 240 Ill. App. 3d 1012,

           1020 (1993); cf. People v. Smith, 72 Ill. App. 3d 956, 964

           (1979)). In addition, plaintiffs rely on Petrillo for the

           proposition that the "privacy rights of individual patients" and

           the "confidential and fiduciary relationship existing between

           patients and their physicians" are compelling interests deserving

           of protection for reasons of public policy. Petrillo, 148 Ill. App.

           3d at 607. 

             In Petrillo, a product liability action, defense counsel

           informed the trial court that he had previously met in private

           with a treating physician for one of the 26 plaintiffs in the case.

           Upon learning of the meeting, plaintiffs' counsel moved to bar

           any future ex parte communications between defense counsel

           and any other physician. The trial court granted the motion and

           entered an order to that effect. Defense counsel, however,

           informed the court that he did not intend to comply with the

           order. The trial court, therefore, held the attorney in direct

           contempt, and the attorney appealed. 

             In affirming the trial court's order, the appellate court

           initially noted that ex parte conferences were not necessary to

           obtain information for defending a lawsuit because the discovery

           methods outlined by Supreme Court Rule 201 were sufficient.

           The court determined that a review of case law from other

           jurisdictions revealed that there was not a single instance in

           which a court found that an ex parte conference was necessary

           to assist defense counsel in obtaining information that they were

           unable to acquire through "regular channels of discovery."

           Petrillo, 148 Ill. App. 3d at 587. 

             The Petrillo court emphasized that society places a high

           value on the professional duties under which a physician

           operates, including the dual duties of confidentiality and loyalty.

           Petrillo, 148 Ill. App. 3d at 589-92. The court noted that certain

           conduct could be against public policy even in the absence of an

           express constitutional or statutory prohibition because public

           policy could be inferred from such sources as statutes or

           constitutions. Reasoning that there exists a strong public policy

           in preserving the sanctity of the patient-physician relationship

           and acknowledging the plaintiff's privacy interests, the court

           determined that ex parte conferences unduly threatened society's

           interest in maintaining the fiduciary and confidential nature of

           the relationship. Petrillo, 148 Ill. App. 3d at 589-96.

           Accordingly, the court held that ex parte conferences between

           a plaintiff's physician and defendant or his counsel should not

           be permitted. Petrillo, 148 Ill. App. 3d at 596.

             In the years following the decision in Petrillo, all five

           districts of our appellate court have followed the decision and,

           although the specific application of Petrillo to various facts has

           differed in some respects, "the fundamental holding that ex parte

           discussions between defense counsel and plaintiff's treating

           physician shall be conducted only through authorized methods

           of discovery has been overwhelmingly approved in subsequent

           Illinois Appellate Court cases." L. Bonaguro & M. Jochner, The

           Petrillo Doctrine: A Review and Update, 83 Ill. B.J. 16, 16

           (1995). Other articles, which have analyzed the policy grounds

           on which the Petrillo court based its decision, have either

           endorsed the prohibition of ex parte communications (see P.

           Corboy, Ex Parte Contacts Between Plaintiff's Physician and

           Defense Attorneys: Protecting the Patient-Litigant's Right to a

           Fair Trial, 21 Loy. U. Chi. L.J 1001 (1990)) or questioned the

           "new type of witness privilege" created in Petrillo and the

           perceived expansion of the original decision beyond its natural

           boundaries (see W. McVisk, A More Balanced Approach to Ex

           Parte Interviews by Treating Physicians, 20 Loy. U. Chi. L.J.

           819 (1989); see also C. Redden & W. Bower, Qualifications to

           the Bar of Ex Parte Contacts With Physicians, 79 Ill. B.J. 442

           (1991)).

             We do not believe it is necessary, practical, or appropriate

           for this court to review every case in which the Petrillo rule has

           been applied, distinguished, or otherwise discussed. However,

           because the legislative decision to eviscerate the Petrillo "rule"

           has been questioned by plaintiffs as part of their challenge to

           section 2--1003(a), we find it appropriate to examine the

           rationale of the Petrillo decision and to ascertain whether there

           exists a constitutional source for the recognition of a strong

           public policy interest in preserving the sanctity of the physician-

           patient relationship. We acknowledge that the Petrillo decision

           did not directly recognize a constitutional basis for its holding,

           and we further acknowledge that there was no issue raised in

           Petrillo that the plaintiff's privacy interest in confidential

           medical information was protected by the Illinois Constitution.

           However, the Petrillo court expressly acknowledged that the

           public policy of this state is reflected in constitutional provisions

           as well as statutes. We believe that it is proper for this court to

           consider the Illinois Constitution's privacy provisions as

           reflective of an important policy. With that in mind, we consider

           the important public policy considerations that the Petrillo court

           found compelling enough to bar ex parte conferences.

             In his appeal from the order holding him in contempt of

           court, the attorney in Petrillo raised several arguments. A group

           of arguments, collectively referred to as the "waiver" challenges,

           stated that a plaintiff, by filing suit, places his mental and

           physical condition at issue, thereby waiving the physician-

           patient privilege. The waiver issue was further broken down into

           10 related arguments in which the attorney sought to justify ex

           parte conferences between defense counsel and the treating

           physicians of the plaintiff. In addition, the attorney posited that

           prohibiting defense counsel from engaging in ex parte

           conferences with a plaintiff's treating physician violated defense

           counsel's first amendment rights. Petrillo, 148 Ill. App. 3d at

           584.

             After initially concluding that ex parte conferences were not

           necessary for the preparation of a defense, the Petrillo court

           announced its disagreement with the defense attorney's

           contention that no public policy in Illinois prohibited ex parte

           conferences. According to the court, "Public policy is found in

           a State's constitution and statutes, and where those are silent, in

           the decisions of the judiciary." Petrillo, 148 Ill. App. 3d at 587.

           Noting that public policy forbids "that conduct which tends to

           harm an established and beneficial interest of society the

           existence of which is necessary for the good of the public," the

           court held that "modern public policy strongly favors the

           confidential and fiduciary relationship existing between a patient

           and his physician." Petrillo, 148 Ill. App. 3d at 587. The court

           stated its belief that this public policy was reflected in at least

           two separate indicia: (1) the code of ethics adopted by the

           medical profession, upon which the public necessarily relies as

           a protection of the confidential relationship existing between a

           patient and his physician; and (2) the fiduciary relationship

           which exists between a physician and his patient, which is

           widely recognized in court opinions. 

             The first indicia of the public policy invaded by ex parte

           conferences, the medical profession's code of ethics, was further

           broken down by the Petrillo court into three "prongs": (1) the

           Hippocratic Oath; (2) The American Medical Association's

           Principles of Medical Ethics; and (3) the Current Opinions of

           the Judicial Council of the AMA (1984 ed.)[fn12]

             Observing that the relationship between doctor and patient

           remains confidential only for so long as a patient can trust that

           his consent is a prerequisite to the disclosure of the information

           he conveyed to his doctor, the Petrillo court concluded that

           when a physician and defense counsel engage in ex parte

           conferences without the consent of the patient, the

           confidentiality which once existed between the doctor and

           patient is irreparably breached and the "sanctity of the

           relationship existing between a patient and his physician is

           thereby destroyed." Petrillo, 148 Ill. App. 3d at 591.

           Significantly, the Petrillo court distinguished between medical

           information which is considered waived by the filing of a

           lawsuit and information which is not waived. The court noted

           that disclosure of information could be accomplished by either

           an express consent or one implied at law by the patient's

           conduct, such as the filing of a lawsuit. With respect to the

           latter situation, the patient filing suit implicitly agrees to his or

           her doctor's release of any medical information related to the

           specific physical or mental condition which the patient has

           placed in issue. However, the plaintiff's implied consent (or

           waiver of information) "is obviously and necessarily limited; he

           consents only to the release of his medical information (relative

           to the lawsuit) pursuant to the methods of discovery authorized

           by Supreme Court Rule 201(a) (87 Ill. 2d R. 201(a))."

           (Emphasis in original.) Petrillo, 148 Ill. App. 3d at 591. The

           plaintiff-patient does not, by the simple act of filing suit,

           consent to ex parte discussions between his treating doctor and

           defense counsel, nor does he consent to disclosure of

           confidential information unrelated to the subject matter of the

           lawsuit. The Petrillo court concluded, consistent with the courts

           of other jurisdictions, that patients have the right to rely on their

           physicians' compliance with the ethical obligations of

           confidentiality, and barring ex parte conferences is a necessary

           adjunct to preserve that right.

             The Petrillo court also discussed what it considered to be

           the second "indicia" of the public policy against ex parte

           conferences between defense counsel and plaintiff's treating

           physicians. Similar to the confidentiality/privacy discussion

           addressed above, this portion of the appellate court's opinion

           found that society has an established interest in the fiduciary

           quality of the physician-patient relationship. Citing cases from

           Illinois and other jurisdictions, the Petrillo court stated that the

           fiduciary relationship between doctor and patient is founded

           upon trust and confidence. Implied in this fiduciary relationship

           is a "good faith" requirement that the physician will not engage

           in conduct adverse to his or her patient, including ex parte

           conferences with the patient's opposing counsel. Emphasizing

           that at the heart of a fiduciary relationship is trust, loyalty, and

           faith in the discretion of the fiduciary, the court in Petrillo

           concluded that ex parte conferences with defense counsel

           constituted a serious breach of trust. Petrillo, 148 Ill. App. 3d

           at 596.

             We believe that the rationale of the Petrillo court is sound

           and that there is a strong public policy against ex parte

           conferences between the plaintiffs' health care practitioners and

           defendants or their representatives. We further believe that the

           privacy interest referred to in the "certain remedy" clause of

           section 12 provides a constitutional source for the protection of

           the patient's privacy interest in medical information and records

           that are not related to the subject matter of the plaintiff's

           lawsuit. We acknowledge that the certain remedy provision has

           been referred to in general as a statement of philosophy rather

           than a guarantee of a specific remedy. See Sullivan v.

           Midlothian Park District, 51 Ill. 2d 274, 277 (1972).

           Nonetheless, we believe that a statement of "constitutional

           philosophy" is reflective of the strong public policy that was

           recognized in Petrillo. Therefore, we conclude that patients in

           Illinois have a privacy interest in confidential medical

           information, and that the Petrillo court properly recognized a

           strong public policy in preserving patients' fiduciary and

           confidential relationship with his or her physicians. [fn13]

           

                  VI. Severability

             We have declared that certain provisions of Public Act 89--

           7 violate the Illinois Constitution. Specifically, we have

           invalidated the cap on noneconomic damages, the provision

           which gives a credit to third-party tortfeasors in the amount of

           the employer's proportionate share of liability, the abolition of

           joint and several liability, and the provision of the Code of Civil

           Procedure which requires the wholesale disclosure of

           confidential medical information upon the filing of a personal

           injury lawsuit. Our next determination is whether the legislature

           would have passed the Act in the truncated form that remains

           after these invalid provisions are eliminated. Under principles of

           severability, we consider whether the provisions that we have

           not declared invalid may be given effect independently, without

           doing violence to the legislative intent in passing the

           comprehensive tort reform legislation. See, e.g., Murneigh, 177

           Ill. 2d at 313-14. If, however, the invalid portions may not be

           severed from the remainder of the Act, the legislation is

           rendered void in its entirety. See, e.g., City of Chicago Heights

           v. Public Service Co., 408 Ill. 604, 610-11 (1951); Dornfeld v.

           Julian, 104 Ill. 2d 261 (1984).

             Whether or not an act is severable is a question of

           legislative intent. E.g., Russell Stewart Oil Co. v. State, 124 Ill.

           2d 116, 128 (1988); Dornfeld, 104 Ill. 2d at 265-66. It has been

           noted that this inquiry is twofold, because the legislature must

           have intended that the act be severable, and the act must be

           capable of severability in fact. See 2 N. Singer, Sutherland on

           Statutory Construction sec. 44.03, at 495 (5th ed. 1993); see also

           City of Chicago Heights, 408 Ill. at 610-11. To determine

           whether an act is severable this court has often repeated, as the

           "settled and governing test of severability," whether the valid

           and invalid provisions of the Act are "so mutually `connected

           with and dependent on each other, as conditions, considerations

           or compensations for each other, as to warrant the belief that the

           legislature intended them as a whole, and if all could not be

           carried into effect the legislature would not pass the residue

           independently ***.' " [Citation.] The provisions are not

           severable if `they are essentially and inseparably connected in

           substance.' " Fiorito v. Jones, 39 Ill. 2d 531, 540-41 (1968);

           accord People ex rel. Rudman v. Rini, 64 Ill. 2d 321, 329

           (1976); Northern Illinois Home Builders Ass'n v. County of

           Du Page, 165 Ill. 2d 25, 48-49 (1995); see also Commercial

           National Bank v. City of Chicago, 89 Ill. 2d 45, 73-74 (1982)

           (and cases cited therein). 

             Determining whether portions of an act are severable is a

           matter of statutory construction, and the existence of a

           severability clause within the statute is not conclusive of the

           issue. Instead, an express severability clause may be viewed as

           a rebuttable presumption of legislative intent. See, e.g.,

           Jacobson v. Department of Public Aid, 171 Ill. 2d 314, 329

           (1996); Commercial National Bank, 89 Ill. 2d at 75; Grennan v.

           Sheldon, 401 Ill. 351, 360-61 (1948). In the case at bar, Public

           Act 89--7 includes a general severability provision, which states:

           "The provisions of this Act, including both the new and the

           amendatory provisions, are severable under section 1.31 of the

           Statute [on] Statutes." Pub. Act 89--7 sec. 990, citing 5 ILCS

           70/1.31 (West 1996). Although the enactment of a severability

           provision reflects a legislative effort to preserve an act

           notwithstanding a declaration of partial invalidity, it has been

           noted that "[b]ecause of the very frequency with which it is

           used, the severability clause is regarded as little more than a

           mere formality." 2 N. Singer, Sutherland on Statutory

           Construction sec. 44.08, at 521 (5th ed. 1993). This court has

           noted that a severability clause "may be useful as an aid in

           determining legislative intent, [but] it is not an `inexorable

           command' [citation] *** `*** and [it] must be applied in

           conformity with the rules of constitutional law.' [Citation.]"

           Commercial National Bank, 89 Ill. 2d at 74. See also People ex

           rel. Chicago Bar Ass'n v. State Board of Elections, 136 Ill. 2d

           513, 532 (1990) (noting that this court "has frequently held that

           unconstitutional provisions of a statute were not severable from

           the remainder of the statute even though the statute itself

           contained a severability clause").

             In Jacobson, 171 Ill. 2d at 329, we held that the

           presumption of severability reflected by an express severability

           clause will be overcome and the entire statute held

           unconstitutional if the legislature would not have passed the

           statute without the provision deemed invalid. Jacobson, 171 Ill.

           2d at 329, citing Northern Illinois Home Builders Ass'n, 165 Ill.

           2d at 48. To determine whether the legislature would have

           passed the statute without the provision declared invalid, the

           courts consider whether the legislative purpose or object in

           passing the act is significantly undercut or altered by the

           elimination of the invalid provisions. For example, in Grennan,

           this court invalidated the entire Hospital Authorities Act of 1947

           after finding that the invalid provisions, which contained an

           arbitrary classification of voters, could not be severed from the

           remaining provisions without defeating the object of the act.

           Grennan, 401 Ill. at 360-61.

             Similarly, in City of Chicago Heights, this court held invalid

           in its entirety a public utility regulatory scheme after finding

           that the license and permit fees imposed by the ordinance were

           excessive and unreasonable as a matter of law. City of Chicago

           Heights, 408 Ill. at 609-10. This court next addressed whether

           the invalid license and permit fee provisions were severable

           from the remainder of the ordinance, which regulated other

           supervisory duties imposed upon the department of streets.

           Holding that the stricken provisions were "manifestly the most

           important part of the regulatory system," this court concluded

           that it could not determine that the council would have adopted

           the ordinance without the provisions that had been declared

           invalid; consequently, the entire ordinance was held null and

           void. City of Chicago Heights, 408 Ill. at 611. See also People

           ex rel. Barrett v. Union Bank & Trust Co., 362 Ill. 164, 170

           (1935) (invalid provision of banking statute held not severable

           from remainder of statute).

             Even in cases where the valid sections of an act are

           complete and capable of being executed, the entire act will be

           declared void if, after striking the invalid provisions, the act that

           remains does not reflect the legislative purpose in enacting the

           legislation. For example in Village of Schaumburg v. Jeep Eagle

           Sales Corp., 285 Ill. App. 3d 481, 489 (1996), the court held

           that certain provisions of a sign ordinance which imposed

           restrictions as to the type, number, and height of flags

           impermissibly distinguished corporate and official flags from all

           other flags. In holding invalid the content-based restrictions, the

           court held that the other restrictions, although complete and

           capable of being executed, could not be severed from the invalid

           portions because the effect of enforcing the remaining provisions

           would be contrary to the original intent of the ordinance. Village

           of Schaumburg, 285 Ill. App. 3d at 489. Similarly, in Lee v.

           Retirement Board of the Policeman's Annuity & Benefit Fund,

           31 Ill. 2d 252 (1964), the invalidation of a portion of an

           amendment rendered the entire amendment void because it no

           longer reflected the legislature's intention, which was to grant

           special pension credits to policemen on a particular eligibility

           roster. Removing the language that limited the preference to the

           one group of officers would have had the unintended effect of

           expanding the application of the preference to a much larger

           group of policemen, thereby increasing the taxpayers' burden.

           Such a result would not be consistent with the legislature's goals

           in enacting the amendment. Lee, 31 Ill. 2d at 255-56. See also

           Union Bank & Trust Co., 362 Ill. at 170; People ex rel. Chicago

           Bar Ass'n, 136 Ill. 2d at 534-36.

             In contrast to the above cases, statutes have been upheld

           notwithstanding the invalidation of a provision where such

           provision was not considered to be so inextricably connected to

           the rest of the act that the legislature would not have passed the

           one portion without the other. For example, in Dornfeld, this

           court held that a two-year limitation period for bringing a

           paternity action violated the equal protection rights of the

           children of unwed parents. Dornfeld, 104 Ill. 2d at 265. On the

           question of severability, this court held that the limitations

           provision could be removed from the Paternity Act without

           violating the purpose of the legislation and thus did not render

           the entire act invalid. Dornfeld, 104 Ill. 2d at 266-67. Similarly,

           in Northern Illinois Home Builders Ass'n, this court reviewed

           and rejected several constitutional challenges to a scheme under

           which Du Page County was authorized to impose transportation

           impact fees on new land developments. One provision under

           review was held invalid under equal protection and uniformity

           principles, as unduly burdening the appeal rights of certain fee

           payers. Northern Illinois Home Builders Ass'n, 165 Ill. 2d at 48.

           In holding that this provision was severable from the remainder

           of the ordinance, we held that the ordinance still served the

           legislature's intent of ensuring that new developments pay their

           fair share of road improvements. Northern Illinois Home

           Builders Ass'n, 165 Ill. 2d at 49. See also Murneigh, 177 Ill. 2d

           at 313-14; Tully v. Edgar, 171 Ill. 2d 297 (1996). 

             After reviewing the general principles of severability

           reflected in the foregoing authorities, we consider the General

           Assembly's intent in passing the legislation introduced as House

           Bill 20 and enacted, without compromise or revisions, as Public

           Act 89--7. As this court has previously noted, legislative history

           is relevant to our analysis of severability. See, e.g., People ex

           rel. Chicago Bar Ass'n, 136 Ill. 2d at 536-37; People v. Porter,

           122 Ill. 2d 64, 81 (1988). It is not disputed that the sponsors

           and supporters of the bill intended to effectuate comprehensive

           reform of the current tort system in Illinois. As such, House Bill

           20 represented a major piece of tort legislation, of unparalleled

           scope and potential impact on the citizens of this state. The

           transcripts of the legislative debate reflect that House Bill 20

           was presented to the full house for vote as a whole, integrated

           piece, and that the presentation of any modifications or

           amendments was discouraged. See 89th Ill. Gen. Assem., House

           Proceedings, February 16, 1995, at 136. It is undisputed that the

           bill was distributed to the full membership of the house minutes

           before midnight on the evening before the floor debates were to

           be held. It is also undisputed that opponents of the bill objected

           to the speed with which the bill, and its restructuring of Illinois

           tort law, was pushed through the legislative process. This

           lengthy piece of legislation with its numerous provisions

           affecting the landscape of tort liability was presented to the full

           house for discussion just hours after its distribution, and was put

           to a vote the next day. No amendments were considered or

           accepted. On the contrary, House Bill 20 was adopted

           unchanged, as an integrated "reform package." One inference to

           be drawn from the manner in which the legislation was adopted

           is that the individual pieces of the package are inseparable from

           the whole.

             Strong support for this inference is defendants' concession

           that the cap on noneconomic damages was considered essential

           to the legislation enacted. According to Representative Cross,

           the sponsor of the bill in the House, "this cap is the centerpiece

           of all these reforms." 89th Ill. Gen. Assem., House Proceedings,

           February 16, 1995, at 19 (statements of Representative Cross).

           The language of the preamble to the Act reinforces that key role

           of the damages cap; out of 17 clauses in the preamble

           characterized as "legislative findings," no less than eight cite

           noneconomic damages as a major concern of the legislature.

           During oral argument of this case, counsel for defendants

           confirmed that the noneconomic cap on damages is central to

           the legislative scheme of tort reform. In fact, so vital to the

           Act's purpose is the cap on noneconomic damages that the

           legislature included, in section 2--1117, an express exception to

           several liability that would operate only in the event that the cap

           was declared invalid. In such a case, the imposition of several

           liability as applied to health care providers is to be replaced

           with joint and several liability, which Public Act 89--7 abolished

           in all types of personal injury cases. As we held elsewhere in

           this opinion, such an attempt to create a limited exception to the

           abolition of joint liability constitutes invalid special legislation.

           For purposes of severability analysis, this legislative attempt to

           single out one class of plaintiffs or tortfeasors for separate

           treatment, based on the eventuality that the cap was invalidated,

           demonstrates that key provisions of the Act are interconnected

           and mutually dependent upon each other.

             In addition to the emphasis that the preamble places on the

           noneconomic damages cap, another important goal expressed in

           the preamble is to reinforce fault-based liability and to insure

           that tortfeasors bear only their proportionate share of liability to

           injured plaintiffs. As a means to accomplish this express goal,

           Public Act 89--7 abolishes joint liability in favor of several

           liability. Ergo, the abolition of joint liability is, like the cap,

           central to the purposes of the Act. The removal of these two

           central goals of Public Act 89--7 (the imposition of the cap and

           the abolition of joint liability) defeats, in large part, its raison

           d'etre.

             The legislation under review is a collection of

           interconnected provisions which address different aspects of tort

           liability, but nonetheless share the overriding determination to

           fulfill the goals set forth in the preamble. The summary of

           legislative purpose in the preamble enumerates these goals,

           which reflect the legislative intent to replace tort liability in its

           current form with a system featuring a damages cap, several

           liability instead of joint and several liability, and a reduction in

           the number of medical malpractice and product liability lawsuits

           filed. Other stated goals include protecting the economic health

           of business and units of local government, protecting the

           availability of affordable liability insurance, and decreasing the

           systemic costs of tort recovery. It is evident from the language

           of the preamble, the provisions of the Act itself, the legislative

           history, and defendants' arguments in the case at bar that Public

           Act 89--7 was intended to have a broad, systemwide impact on

           the litigation of personal injury lawsuits. As such,

           implementation of the Act's provisions would modify or

           supplant a vast body of tort principles developed in many

           decisions of Illinois courts. For purposes of severability analysis,

           we cannot conclude that the legislature would have intended to

           pass a version of tort reform that did not include the measures

           by which to accomplish its goals.

             In summary, core provisions of Public Act 89--7 have been

           declared unconstitutional by this court. Without these core

           provisions, which were essential to the passage of the Act and

           which are inseparable from the remainder of Public Act 89--7,

           the legislation must fail in toto. We conclude that we cannot

           hold independently enforceable that residue which remains of

           Public Act 89--7 after eliminating the core provisions through

           which the Act intended to accomplish its goals. To do so we

           would be, in effect, rewriting Public Act 89--7 and refashioning

           it into another piece of legislation that the legislature cannot be

           presumed to have intended to enact. As this court observed in

           Commercial National Bank, 89 Ill. 2d at 75, " `[t]he new law

           would be created by this court and not by the General

           Assembly, because it enacted a different one. This would

           amount to a delegation of legislative powers to the courts, which

           is contrary to article III of the constitution, as well as numerous

           decisions of this court.' [Citation]." Accordingly, we hold that

           Public Act 89--7 is void in its entirety.

           

           VII. Other Provisions of Public Act 89--7 

             Because of our severability holding, we address only briefly

           the other specific provisions of the Act that were challenged in

           the instant appeal. The circuit court ruled that section 2--1107.1,

           which describes three jury instructions to be given in tort

           actions, is unconstitutional. One jury instruction would prevent

           the jury from being informed about the cap on noneconomic or

           punitive damages. Clearly, this instruction is nullified by our

           declaration that the cap itself is unconstitutional. See 2 N.

           Singer, Sutherland on Statutory Construction sec. 44.04, at 502

           (5th ed. 1993) ("Even where part of an act is independent and

           valid, other parts which are not themselves substantively invalid

           but have no separate function to perform independent of the

           invalid portions of the act are also held invalid"). The other two

           jury instructions are not clearly invalid, however. One of these

           jury instructions would require the court to inform the jury that

           compensatory and punitive damage awards are not taxable. The

           other instruction would prevent the jury from being informed

           that the plaintiff would not recover any damages if his or her

           contributory negligence exceeded 50% percent. Because of our

           determination that the valid provisions of the Act are not

           severable from the invalid provisions, we strike these two

           instructions without expressing any opinion regarding their

           constitutionality independent of the Act.

             The circuit court also invalidated five specific provisions

           that relate to product liability actions. One provision, section 2--

           623, requires product liability plaintiffs to attach a certificate of

           merit to their complaint as a prerequisite for initiating an action

           to recover damages. 735 ILCS 5/2--623 (West 1996). Although

           a certificate of merit requirement in medical malpractice actions

           was upheld by this court in DeLuna v. St. Elizabeth's Hospital,

           147 Ill. 2d 57, 75 (1992), plaintiffs attempt to distinguish

           DeLuna and also, in the alternative, request us to reconsider the

           DeLuna holding. Another section, which amends the existing

           product liability statute of repose, extends the limitation periods

           and outside period of repose to include all theories of product

           liability. 735 ILCS 5/13--213(b) (West 1996). In contrast, the

           prior version of the repose statute excluded negligence from its

           scope. See 735 ILCS 5/13--213(b) (West 1994). Defendants

           contend that this court's decision in Mega v. Holy Cross

           Hospital, 111 Ill. 2d 416, 422 (1986), which upheld a four-year

           statute of repose in medical malpractice actions, is persuasive

           authority for upholding the constitutional validity of section 13--

           213(b). Two other provisions that were declared invalid by the

           circuit court, sections 2--2103 and 2--204, create statutory

           presumptions as to when a product is considered reasonably

           safe. Section 2--2103 attaches a presumption of safety to any

           product that meets state or federal safety standards. 735 ILCS

           5/2--2103 (West 1996). Section 2--2104 provides that the design

           of a product or component shall be presumed to be reasonably

           safe unless the plaintiff can establish that, at the time the

           product left the manufacturer's control, "a practical and

           technically feasible alternative design was available that would

           have prevented the harm without significantly impairing the

           usefulness, desirability, or marketability of the product." 735

           ILCS 5/2--2104 (West 1996). The fifth provision, section 2--

           2106, imposes a presumption that if written warnings are given

           to users of products, such warnings shall be deemed adequate if

           they conform to generally recognized standards in the industry

           at the time the product was introduced into the stream of

           commerce. 735 ILCS 5/2--2106 (West 1996).

             We do not determine, in this case, whether or not the above

           product liability provisions are infirm as a matter of substantive

           constitutional law. We note that defendants, in addition to

           arguing in favor of the constitutionality of the provisions, have

           raised waiver and ripeness as reasons for this court to reject the

           circuit court's holding that the product liability provisions in

           issue are unconstitutional. For example, defendants contend that

           plaintiff Best waived his challenge to the filing of a certificate

           of merit because he did, in fact, obtain and file an expert's

           affidavit in support of his cause of action. Plaintiff Best

           responds that his filing of the product liability certificate of

           merit was done under protest, without waiving his challenge.

           Defendants also challenge, at this early stage in the litigation,

           the ripeness of a constitutional challenge to the provisions which

           allow product liability defendants to benefit from evidentiary

           presumptions. Plaintiffs dispute defendants' ripeness argument

           and urge this court to resolve the constitutionality of the

           provisions under review.

             We believe that we should exercise caution and restraint in

           making any ruling, apart from our severability holding, on the

           constitutionality of these product liability provisions. Without

           indicating how this court might rule in a future case involving

           a possibly reenacted version of the challenged provisions, we

           simply note that if we were to hold that the provisions in issue

           were not facially invalid, we would be rendering an advisory

           opinion on a portion of Public Act 89--7 that has been held

           inseverable from the unconstitutional provisions. If we were to

           hold that some but not all five of the provisions were

           unconstitutional, we would be making a selective determination

           of individual provisions within the larger product liability

           scheme that is contemplated by the instant Act. We decline to

           engage in speculative analysis or to render an advisory opinion

           on the efficacy of the product liability provisions where, as in

           the instant case, such analysis or opinion is not necessary for the

           disposition of the cause.

             In conclusion, although the circuit court declared the

           product liability provisions of the Act invalid, as well as the

           provisions setting forth three jury instructions to be given in tort

           actions, we decline to reach the substantive merits of the

           constitutional challenges made to those provisions for the

           reasons stated. Accordingly, we vacate that portion of the circuit

           court's holding that reached the substantive merits of the

           products liability issues and the jury instructions, but otherwise

           affirm the judgment of the circuit court in its entirety. We

           emphasize that all of the remaining provisions of Public Act 89-

           -7, which were not challenged in the instant cases, are deemed

           invalid in this case solely on grounds of severability. As such,

           the General Assembly is free to reenact whatever provisions it

           deems desirable or appropriate.

             The problems addressed in the briefs and in oral arguments

           in the case at bar represent some of the most critical concerns

           which confront our society today. We acknowledge and wish to

           commend the attorneys for the plaintiffs, the defendants, amici,

           and Attorney General on the scholarly and impressive briefs and

           oral arguments submitted by each.

           

           Circuit court judgment affirmed.

                                                   

                                                       JUSTICE HEIPLE took no part in the consideration or

           decision of this case.

           

             JUSTICE BILANDIC, specially concurring:

             I concur in the majority's judgment invalidating Public Act

           89--7 in its entirety. I write separately to state that I do not join

           in the majority's discussion of the constitutionality of the

           damages cap under the separation of powers doctrine as that

           discussion is wholly unnecessary and constitutes dicta.

           

             JUSTICE MILLER, concurring in part and dissenting in

           part:

             I joined the court's opinion in Kunkel v. Walton, No. 81176

           (November 20, 1997), and therefore I concur in the portion of

           the present judgment that reaffirms our holding in that case. I do

           not agree with the majority's disposition of the remaining issues

           addressed in the present opinion, however, and accordingly I

           dissent from those portions of the majority opinion.

           

           

                          I

             Legislation is presumed to be valid, and a party challenging

           the constitutionality of a statute has the burden of establishing

           its invalidity. DeLuna v. St. Elizabeth's Hospital, 147 Ill. 2d 57,

           67 (1992); Pre-School Owners Ass'n of Illinois, Inc. v.

           Department of Children & Family Services, 119 Ill. 2d 268, 275

           (1988); Sayles v. Thompson, 99 Ill. 2d 122, 124-25 (1983). This

           court's role in evaluating these provisions is necessarily limited.

           Our function here is not to determine whether the legislature has

           chosen the best or most effective means of resolving the

           problems addressed in the legislation. "Our nation was founded

           in large part on the democratic principle that the powers of

           government are to be exercised by the people through their

           elected representatives in the legislature, subject only to certain

           constitutional limitations. Although this court has never hesitated

           to invalidate laws that it believes to be unconstitutional, we

           emphasize that our role is a limited one. The issue here is `not

           what the legislature should do but what the legislature can do.'

           [Citation.]" People v. Kohrig, 113 Ill. 2d 384, 392-93 (1986).

           Accordingly, the question before this court is not whether the

           measures contained in the Civil Justice Reform Amendments of

           1995 (the Act) are wise, but simply whether they are

           constitutional. Bernier v. Burris, 113 Ill. 2d 219, 229-30 (1986).

             Our cases have repeatedly recognized that no one possesses

           a vested right in the continuation of any particular remedy or

           mode of recovery. First of America Trust Co. v. Armstead, 171

           Ill. 2d 282, 291 (1996); Bernier v. Burris, 113 Ill. 2d 219, 236

           (1986); Trexler v. Chrysler Corp., 104 Ill. 2d 26, 30 (1984).

           Subject only to the collective will of the voters and to the

           constraints of the federal and state constitutions, the legislature

           enjoys broad power to change the common law, and to modify

           and even eliminate statutory and common law rights and

           remedies. In People v. Gersch, 135 Ill. 2d 384, 395 (1990), this

           court explained, "The legislature is formally recognized as

           having a superior position to that of the courts in establishing

           common law rules of decision. The Illinois General Assembly

           has the inherent power to repeal or change the common law, or

           do away with all or part of it. [Citations.]" "[T]his pervasive

           power of the legislature to alter the common law" (Gersch, 135

           Ill. 2d at 395) reflects the legislature's superior role in

           articulating public policy. In Collins v. Metropolitan Life

           Insurance Co., 232 Ill. 37, 44 (1907), this court explained the

           proper hierarchy between the legislative and judicial branches in

           matters of public policy:

               "When the sovereign power of the State has by written

                          constitution declared the public policy of the State on a

                          particular subject, the legislative and judicial

                          departments of the government must accept such

                          declaration as final. When the legislature has declared,

                          by law, the public policy of the State, the judicial

                          department must remain silent, and if a modification or

                          change in such policy is desired the law-making

                          department must be applied to, and not the judiciary,

                          whose function is to declare the law but not to make it."

           See also Roanoke Agency, Inc. v. Edgar, 101 Ill. 2d 315, 327

           (1984) (quoting Collins); Stroh v. Blackhawk Holding Corp., 48

           Ill. 2d 471, 483 (1971) (same).

             Our cases are replete with references to the legislature's

           authority to determine public policy, to prescribe solutions to

           problems, and to alter the common law. For example, in Maki

           v. Frelk, 40 Ill. 2d 193, 196 (1968), this court declined to adopt

           a system of comparative negligence, concluding instead that

           "such a far-reaching change, if desirable, should be made by the

           legislature rather than by the court. The General Assembly is the

           department of government to which the constitution has

           entrusted the power of changing the laws." Although this court

           later decided to adopt comparative negligence on its own,

           without waiting for legislative action (see Alvis v. Ribar, 85 Ill.

           2d 1 (1981)), the court did so not because it believed that the

           legislature lacked the authority to make that change, but for

           other reasons. Later, the legislature rejected the pure form of

           comparative fault adopted by this court in Alvis, replacing it

           with a modified version (735 ILCS 5/2--1116 through 2--1118

           (West 1996)), which has withstood constitutional challenge (see

           Reuter v. Korb, 248 Ill. App. 3d 142 (1993)).

             More recently, in Committee for Educational Rights v.

           Edgar, 174 Ill. 2d 1, 29-32 (1996), this court declined to rule

           that the current method of funding public schools is

           unconstitutional, deciding instead to defer to the legislature's

           superior ability to establish public policy and to devise

           appropriate answers to questions facing our society. Although it

           is certainly true that the power of the legislature to act in a

           particular field is not a license to act unconstitutionally, the

           legislature generally enjoys broad discretion in its determinations

           of public policy.

             The majority does not disagree with these basic principles

           of review, yet the court reaches conclusions that are far different

           from what our precedents require, and that strike at the heart of

           the venerable and fundamental relationship between the

           legislative and judicial branches. The majority undermines these

           principles when it effectively substitutes its own view of public

           policy for the legislature's considered judgment.

           

                         II

             The majority devotes a substantial part of its opinion to a

           discussion of the $500,000 limit imposed by the Act on the

           recovery of noneconomic losses in personal injury actions. The

           majority's principal conclusion is that the statute violates the

           Illinois Constitution's prohibition on special legislation. Ill.

           Const. 1970, art. IV, sec. 13. Applying the rational basis test,

           the majority assiduously attempts to locate its special legislation

           analysis within the framework of our case law, but the

           majority's analysis actually marks a significant departure from

           precedent.

             The Act's limitation on the recovery of noneconomic

           damages is found in section 2--1115.1 of the Code of Civil

           Procedure (735 ILCS 5/2--1115.1 (West 1996)). Section 2--

           1115.1(a) provides:

                      "In all common law, statutory or other actions that

                          seek damages on account of death, bodily injury, or

                          physical damage to property based on negligence, or

                          product liability based on any theory or doctrine,

                          recovery of non-economic damages shall be limited to

                          $500,000 per plaintiff. There shall be no recovery for

                          hedonic damages."

           Noneconomic damages are defined as "damages which are

           intangible, including but not limited to damages for pain and

           suffering, disability, disfigurement, loss of consortium, and loss

           of society." 735 ILCS 5/2--1115.2(b) (West 1996). In contrast,

           economic damages, upon which no limit is imposed, are "all

           damages which are tangible, such as damages for past and future

           medical expenses, loss of income or earnings and other property

           loss." 735 ILCS 5/2--1115.2(a) (West 1996). The amount of the

           limitation on noneconomic damages is to be adjusted annually

           to reflect changes in the consumer price index. 735 ILCS 5/2--

           1115.1(b) (West 1996).

             "It is well settled that review of a special legislation

           challenge is governed by the same standard that applies to

           review of equal protection challenges. [Citations.]" Cutinello v.

           Whitley, 161 Ill. 2d 409, 417 (1994). The statute at issue does

           not impinge on a fundamental right or delimit a suspect or

           quasi-suspect classification, so the appropriate standard of

           review that governs the plaintiffs' special-legislation challenge

           is the rational basis test, as the majority correctly determines. A

           court applying this standard must decide whether the challenged

           classification is rationally related to a legitimate governmental

           interest. Nevitt v. Langfelder, 157 Ill. 2d 116, 125 (1993);

           Chicago National League Ball Club, Inc. v. Thompson, 108 Ill.

           2d 357, 368 (1985). The considerations that govern a court's

           review of a statute under the rational basis test are familiar and

           have been stated as follows:

               "A statute will be held unconstitutional as special

                          legislation and as violative of the equal protection

                          guarantee only if it was enacted for reasons totally

                          unrelated to the pursuit of a legitimate State goal.

                          [Citation.] The legislature has broad latitude and

                          discretion in drawing statutory classifications to benefit

                          the general welfare, and the classifications it makes are

                          presumed to be valid. A legislative classification will be

                          upheld if any set of facts can be reasonably conceived

                          which justify distinguishing the class to which the law

                          applies from the class to which the statute is

                          inapplicable. [Citations.]" Bilyk v. Chicago Transit

                          Authority, 125 Ill. 2d 230, 236 (1988).

             Contrary to the majority's holding, I would conclude that

           the limit on noneconomic losses contained in the Act does not

           violate the special legislation prohibition of the Illinois

           Constitution, for the provision at issue readily satisfies the

           requirements of the rational basis test. Reform of the civil

           justice system is surely a legitimate governmental goal, and

           imposing a $500,000 limit on the recovery of noneconomic

           damages is rationally related to those ends. Noneconomic losses

           by their nature resist precise measurement. Economic losses,

           which include items such as medical expenses, lost income, and

           lost support, are objective and are readily quantifiable. In

           contrast, noneconomic losses, which includes pain and suffering,

           among other things, are subjective and therefore more difficult

           to quantify. There is great difficulty in determining proper

           compensation for noneconomic losses, and awards for such

           damages will vary greatly from case to case. Thus, there is a

           rational basis for the legislature's decision to distinguish

           between economic and noneconomic damages.

             Limiting compensation for noneconomic losses is rationally

           related to the objectives of the legislation. As the preamble to

           the Act evidences, the legislature was concerned about

           disparities, inconsistencies, and the lack of predictability in the

           awarding of noneconomic damages, and about the costs to

           society of unrestricted compensation for those damages. The

           legislature believed that imposing a limit on the recovery of

           noneconomic losses would promote fairness and would help

           reduce the costs of the tort system. Some will argue that the

           amount selected by the legislature in the provision at issue here

           is too low. Although that might be a valid objection to the Act

           as an expression of public policy, for each of us would probably

           set the limit at a greater or lesser level, it is not a constitutional

           defect in the legislation. Like a repose statute, the limit on the

           recovery of noneconomic losses reflects the balance struck by

           the legislature between an individual's interest in compensation

           for his or her own injuries, and the public's interest in an

           affordable system of tort law. See Mega v. Holy Cross Hospital,

           111 Ill. 2d 416, 428 (1986).

             Again, to uphold the statute we need not be convinced of

           the correctness of the legislature's judgment--we need only find

           that the question is debatable and that the legislature has

           adopted a rational means of achieving the desired ends. Bernier

           v. Burris, 113 Ill. 2d 219, 229-30 (1986). In Minnesota v.

           Clover Leaf Creamery Co., 449 U.S. 456, 464, 66 L. Ed. 2d

           659, 668-69, 101 S. Ct. 715, 724 (1981), the Supreme Court

           articulated the appropriate degree of deference:

                      "But States are not required to convince the courts of

                          the correctness of their legislative judgments. Rather,

                          `those challenging the legislative judgment must

                          convince the court that the legislative facts on which the

                          classification is apparently based could not reasonably

                          be conceived to be true by the governmental

                          decisionmaker.' Vance v. Bradley [440 U.S. 93, 111, 59

                          L. Ed. 2d 171, 184-85, 99 S. Ct. 939, 949-50 (1979)].

                          [Citations.]

                      Although parties challenging legislation under the

                          Equal Protection Clause may introduce evidence

                          supporting their claim that it is irrational, United States

                          v. Carolene Products Co. [304 U.S. 144, 153-54, 82 L.

                          Ed. 1234, 1242, 58 S. Ct. 778, 784 (1938)], they cannot

                          prevail so long as `it is evident from all the

                          considerations presented to [the legislature], and those

                          of which we may take judicial notice, that the question

                          is at least debatable.' [304 U.S. at 154, 82 L. Ed. at

                          1243, 58 S. Ct. at 784.] Where there was evidence

                          before the legislature reasonably supporting the

                          classification, litigants may not procure invalidation of

                          the legislation merely by tendering evidence in court

                          that the legislature was mistaken."

           Thus, under rational basis review, "a legislative choice is not

           subject to courtroom factfinding and may be based on rational

           speculation unsupported by evidence or empirical data.

           [Citations.]" Federal Communications Comm'n v. Beach

           Communications, Inc., 508 U.S. 307, 315, 124 L. Ed. 2d 211,

           222, 113 S. Ct. 2096, 2102 (1993).

             In deciding that the cap on noneconomic losses is invalid

           special legislation, the majority tests the provision against

           specially selected hypothetical cases that are obviously designed

           to illustrate defects in the statute. Slip op. at 24-26. The

           legislature, however, makes no pretense that the reform

           measures at issue here are a panacea for all the ills, perceived

           or otherwise, in our system of tort law. Nor is it necessary that

           legislation like this have such miraculous effect. Under rational

           basis review, we ask only whether the means chosen by the

           legislature are rationally related to the purposes of the law. In

           contrast to the examples posited by the majority, one could as

           easily select hypothetical cases that support and sustain the

           remedy devised by the legislature. We have never before

           required legislation under rational basis scrutiny to qualify under

           a standard as rigorous as that applied by the majority. In People

           v. Kohrig, 113 Ill. 2d 384, 402-03 (1986), in the course of

           sustaining the validity of the mandatory seat belt law, we

           observed, " `[T]he law need not be in every respect logically

           consistent with its aims to be constitutional. It is enough that

           there is an evil at hand for correction, and that it might be

           thought that the particular legislative measure was a rational

           way to correct it.' (Williamson v. Lee Optical of Oklahoma, Inc.,

           (1955), 348 U.S. 483, 487-88, 99 L. Ed. 2d 563, 572, 75 S. Ct.

           461, 464.)"

             Nor is today's decision compelled by Wright v. Central Du

           Page Hospital Ass'n, 63 Ill. 2d 313 (1976), Grace v. Howlett,

           51 Ill. 2d 478 (1972), or Grasse v. Dealer's Transport Co., 412

           Ill. 179 (1952), as the majority believes. In all three cases the

           court found special legislation violations. The statutes at issue

           in those cases, however, were much different from the measure

           involved here. The statute challenged in Wright imposed a limit

           of $500,000 on the total amount of damages, both economic and

           noneconomic, that could be recovered by a plaintiff in a medical

           malpractice action. The court found the statute to be a violation

           of the special legislation prohibition, concluding that medical

           malpractice plaintiffs had been arbitrarily selected to bear the

           burden of being limited in the total amount of compensation

           they were allowed to receive for their injuries. Both these

           concerns are alleviated in the provision at issue here, which is

           broader in scope but narrower in effect: the statute applies to all

           actions for personal injury, but it limits only a plaintiff's

           recovery of noneconomic losses and does not impose any cap on

           the recovery of economic losses. Moreover, in Anderson v.

           Wagner, 79 Ill. 2d 295, 304-05 (1979), this court counseled that

           Wright should not be read "too broadly," noting that the statute

           in Wright could have prevented the full recovery of medical

           expenses. Anderson rejected constitutional challenges, including

           one of special legislation, to a statute of limitations for medical

           malpractice actions.

             Grace and Grasse are also distinguishable. The legislation

           challenged in Grace limited an injured plaintiff's ability to

           recover compensation for injuries incurred in traffic accidents,

           depending on whether the other party was using the vehicle for

           personal or commercial purposes. In Grasse a provision of the

           Worker's Compensation Act would have transferred an injured

           employee's action against a third-party tortfeasor to the

           plaintiff's employer if the third party's employee was also

           covered by the Act. In neither case was the court able to discern

           a rational basis for the classifications drawn by the legislature.

             I believe that the opposite conclusion is required here. In

           contrast to the measures at issue in Wright, Grace, and Grasse,

           the limit on the recovery of noneconomic losses bears a rational

           relationship to a legitimate governmental purpose. Here, the

           legislature could find that a $500,000 limitation on noneconomic

           damages would reduce the costs to society of allowing

           compensation for damages that, by their nature, are subjective

           and difficult to measure. For these reasons, I would join the

           group of jurisdictions that have upheld, against corresponding

           challenges on equal protection grounds, similar limits on the

           recovery of damages in tort actions. See, e.g., Davis v.

           Omitowoju, 883 F.2d 1155 (3d Cir. 1989) (applying Virgin

           Islands law; $250,000 limit on noneconomic damages in medical

           malpractice actions); Boyd v. Bulala, 877 F.2d 1191 (4th Cir.

           1989) (applying Virginia law; $750,000 limit on damages in

           medical malpractice actions); Fein v. Permanente Medical

           Group, 38 Cal. 3d 137, 695 P.2d 665, 211 Cal. Rptr. 368

           (1985); Scholz v. Metropolitan Pathologists, P.C., 851 P.2d 901

           (Colo. 1993) ($250,000 limit on noneconomic damages and

           $1,000,000 on total damages in medical malpractice actions);

           Johnson v. St. Vincent Hospital, Inc., 273 Ind. 374, 404 N.E.2d

           585 (1980) ($500,000 limit on damages in medical malpractice

           actions); Murphy v. Edmonds, 325 Md. 342, 601 A.2d 102

           (1992) ($350,000 limit on noneconomic damages in personal

           injury actions); Etheridge v. Medical Center Hospitals, 237 Va.

           87, 376 S.E.2d 525 (1989) ($750,000 limit on damages in

           medical malpractice actions); Robinson v. Charleston Area

           Medical Center, 186 W. Va. 720, 414 S.E.2d 877 (1991)

           ($1,000,000 limit on noneconomic damages in medical

           malpractice actions).

             Perhaps uncertain of its own conclusion, the majority

           opinion goes on to consider an alternative argument against the

           limit on noneconomic damages, hoping to persuade the reader

           by prolixity, if not by force of reasoning. Here, the majority

           finds that the limit on the recovery of noneconomic damages

           functions as a legislatively imposed remittitur and for that

           reason violates the separation of powers doctrine. The majority's

           discussion of this additional argument is entirely unnecessary,

           given the majority's prior holding that the same measure is

           invalid special legislation. On the merits, I disagree with the

           majority's conclusion that the cap on noneconomic damages

           improperly intrudes on the judicial power of remittitur. The

           challenged provision does not represent a finding about the

           evidence of any particular case, and it does not detract from the

           power of a court to reduce an award of damages in appropriate

           circumstances. Remittitur pertains to judges and juries, not the

           legislature; by characterizing the cap on damages as a remittitur,

           the majority is simply erecting and demolishing a strawman.

           The majority's broad holding on this question means, in essence,

           that the legislature may never impose a limit on damages, at

           least in common law actions. Given the implications of this

           holding and the absence of any need to discuss the issue, I

           would not join this part of the majority opinion even if I agreed

           with the court that the caps provision was invalid special

           legislation.

           

                         III

             The majority's lengthy treatment of several other provisions

           of the Act is also superfluous, given the court's conclusion that

           the $500,000 limit on the recovery of noneconomic damages is

           invalid special legislation, and the court's subsequent holding

           that the damages cap is not severable from the remainder of the

           Act. The majority's discussion of these other issues is simply

           unnecessary to the court's resolution of the appeals and should

           be recognized as the dicta that it is.

             First, the majority considers section 3.5 of the Contribution

           Act. The majority concludes that the new provision is internally

           inconsistent and could allow an improper "double reduction" of

           damages awarded to an injured employee in an action against a

           third-party tortfeasor. I agree with the defendants that the

           legislature could not have intended to permit a double reduction

           in damages and that the measure should be interpreted

           accordingly. In that manner, the constitutionality of the

           provision can be preserved.

             The majority next considers the validity of the modification

           made to section 2--1117 of the Code of Civil Procedure (735

           ILCS 5/2--1117 (West 1996)), abolishing joint and several

           liability. In discussing this provision the majority initially

           pursues several lines of thought until it finally settles on one,

           determining that the measure violates the special legislation

           prohibition of our state constitution because it selectively

           restores joint and several liability in medical malpractice cases

           in the event that the cap on noneconomic losses is found

           invalid. Although the purpose of the provision restoring joint

           and several liability in the area of medical malpractice might be

           somewhat obscure, I do not agree that it is unconstitutional on

           that ground alone. Separately, because I believe that the cap on

           noneconomic losses is not invalid for the reasons found by the

           majority, I cannot agree with the majority's conclusion that the

           provision restoring joint and several liability in medical

           malpractice cases has even been triggered.

             The majority also considers the constitutionality of the

           physician-patient disclosure provisions. Just last month, in

           Kunkel v. Walton, No. 81176 (November 20, 1997), this court

           invalidated the same provisions. The majority in the present case

           now relies on a somewhat different rationale to reach the same

           conclusion. While I agree with the result, I do not agree with its

           alternative holding that the statutes violate a right of privacy that

           the majority locates in the "certain remedy" provision found in

           article I, section 12, of the Illinois Constitution (Ill. Const. 1970,

           art. I, sec. 12).

             Contrary to the majority's view, our prior cases construing

           the "certain remedy" provision of the constitution have

           characterized it as an expression of a philosophy rather than as

           a guarantee of the continued existence of any particular cause of

           action or form of recovery. See Mega v. Holy Cross Hospital,

           111 Ill. 2d 416, 424 (1986); Sullivan v. Midlothian Park

           District, 51 Ill. 2d 274, 277 (1972). It should be noted,

           moreover, that the majority's discussion of the certain remedy

           provision is entirely unnecessary, for the majority finds the

           discovery statutes invalid on the separate and independent

           ground that they violate the separation of powers doctrine.

           

                         IV

             As a final matter, I disagree with the majority's conclusion

           that the portions of the Civil Justice Reform Amendments of

           1995 found unconstitutional here and in Kunkel v. Walton, No.

           81176 (November 20, 1997), cannot be severed from the

           remainder of the Act and that the invalidity of those measures

           therefore dooms the entire body of legislation. Contrary to the

           majority's holding, there is compelling evidence that the

           legislature intended for the different provisions of the Act to be

           severable from each other.

             The question of severability is essentially one of legislative

           intent. People v. Warren, 173 Ill. 2d 348, 371 (1996); Tully v.

           Edgar, 171 Ill. 2d 297, 313 (1996); Russell Stewart Oil Co. v.

           State of Illinois, 124 Ill. 2d 116, 128 (1988); Springfield Rare

           Coin Galleries, Inc. v. Johnson, 115 Ill. 2d 221, 237 (1986). As

           expressed by this court in Fiorito v. Jones, 39 Ill. 2d 531, 541

           (1968):

               "The settled and governing test of severability is

                          whether the valid and invalid provisions of the Act are

                          `so mutually "connected with and dependent on each

                          other, as conditions, considerations or compensations for

                          each other, as to warrant the belief that the legislature

                          intended them as a whole, and if all could not be

                          carried into effect the legislature would not pass the

                          residue independently ***".' [Citation.] The provision

                          are not severable if `they are essentially and inseparably

                          connected in substance.' [Citations.]"

             Notably, the Act contains an express severability clause,

           which states, "The provisions of this Act, including both the

           new and the amendatory provisions, are severable under Section

           1.31 of the Statute o[n] Statutes." Pub. Act 89--7, sec. 990, eff.

           March 9, 1995. The general severability provision found in

           section 1.31 of the Statute on Statutes provides:

                      "If any provision of an Act *** or application thereof

                          to any person or circumstance is held invalid, such

                          invalidity does not affect other provisions or

                          applications of the Act which can be given effect

                          without the invalid application or provision, and to this

                          end the provisions of each Act *** are severable, unless

                          otherwise provided by the Act." 5 ILCS 70/1.31 (West

                          1996).

           Although the presence of an express severability clause is not

           dispositive of the question, it does establish a presumption that

           the various provisions of a body of legislation are severable.

           Jacobson v. Department of Public Aid, 171 Ill. 2d 314, 329

           (1996); People ex rel. Chicago Bar Ass'n v. State Board of

           Elections, 136 Ill. 2d 513, 532 (1990).

             Moreover, the various provisions of the Act are not so

           interrelated that one must conclude that the elimination of the

           provisions struck down by the majority means that the

           remainder of the Act also falls. Although the majority

           characterizes the invalid portions of the Act as "core provisions"

           whose removal yields an unenforceable "residue" (slip op. at 80-

           81), the remaining provisions are actually substantial measures

           in their own right that are independent of the provisions

           invalidated here. In Grasse v. Dealer's Transport Co., 412 Ill.

           179, 202 (1952), this court stated:

               "The established rule is that only the invalid parts of a

                          statute are without legal effect, unless all the provisions

                          are so connected as to depend upon each other.

                          [Citations.] If that which remains after the

                          unconstitutional portion is stricken is complete in itself

                          and capable of being executed wholly independently of

                          that which is rejected, the invalid portion does not

                          render the entire section or act unconstitutional."

             Although all the provisions contained in the Act are related

           to tort law generally, they are not so intertwined or interrelated

           that the failure of any one measure, such as the provision

           limiting the recovery of noneconomic damages, necessitates the

           corresponding failure of any other measure, such as the

           provision requiring a certificate of merit in products liability

           actions. The limit on the recovery of noneconomic damages and

           the requirement of a certificate of merit function independently

           of each other, and there is no reason to believe that the

           legislature would not have enacted one in the absence of the

           other. Moreover, although the legislature might have viewed the

           limit on noneconomic losses as one of the most significant parts

           of the legislative package, the invalidity of that provision does

           not undermine the operation of the remaining provisions. As this

           court explained in People ex rel. Dougherty v. City of Rock

           Island, 271 Ill. 412, 422 (1915):

               " `If a statute attempts to accomplish two or more

                          objects and is void as to one, it may still be in every

                          respect complete and valid as to the other; but if its

                          purpose is to accomplish a single object, only, and some

                          of its provisions are void, the whole must fail unless

                          sufficient remains to effect the object without the aid of

                          the invalid portion.' "

           In the present case, whether the Act is viewed as having

           multiple purposes accomplished in multiple ways, or a single

           purpose accomplished in multiple ways, I believe that the

           legislature intended that the measures found invalid by the

           majority would be severed from the remaining provisions of the

           Act.

             The Act itself contains further proof that the legislature

           believed that any portion found to be invalid would be

           severable. The provision restoring joint and several liability in

           medical malpractice actions in the event that the cap on

           noneconomic damages is found unconstitutional represents

           compelling evidence that the legislature intended for the various

           provisions of the Act--or at least the cap on damages, the crux

           of the majority's antiseverability argument--to be severable from

           the other. The majority believes that the provision restoring joint

           and several liability "demonstrates that key provisions of the Act

           are interconnected and mutually dependent upon each other"

           (slip op. at 80) and thus supports a finding of nonseverability.

           In my view, however, the provision compels the opposite

           conclusion, for it establishes that the legislature was concerned

           about the possible invalidation of the cap on noneconomic

           damages and intended for the remaining portions of the Act to

           survive any adverse judicial ruling. Clearly, the legislators

           would not have crafted a response to that contingency if they

           had thought that a ruling invalidating the limit on noneconomic

           damages would drag down the remaining provisions of the Act.

           Whether or not the legislature considered the cap on

           noneconomic damages to be the most important feature of the

           Act, as the majority asserts, it is clear that the legislature did not

           believe that the failure of that measure would doom the rest of

           the Act.

             In sum, given the presence of a severability clause in the

           Act, the ability of the valid measures to stand independently of

           those found invalid, and the legislature's concern about a ruling

           striking down a portion of this body of legislation, I would

           conclude that the provisions found unconstitutional here are

           severable from the remainder of the Act.

           

                        * * *

             Although I agree with the majority that the physician-patient

           disclosure provisions are invalid, for the reasons expressed by

           the court in Kunkel v. Walton, No. 81176 (November 20, 1997),

           I do not agree that the limit on noneconomic damages is invalid

           special legislation or violates the separation of powers clause.

           Nor do I agree with the majority's further conclusion that the

           provisions found invalid here and in Kunkel are not severable

           from the remainder of the Act, and I would therefore consider

           in this appeal the plaintiffs' remaining challenges to the

           provisions of the Act. As I have noted, the judicial role in

           assessing the constitutionality of legislation is quite limited, and

           the majority's result here cannot be defended under traditional

           standards of review. Today's decision represents a substantial

           departure from our precedent on the respective roles of the

           legislative and judicial branches in shaping the law of this state.

           Stripped to its essence, the majority's mode of analysis simply

           constitutes an attempt to overrule, by judicial fiat, the considered

           judgment of the legislature.

           

           

           

           [fn1] An example which was cited frequently in the legislative

           debates is the infamous McDonald's spilled coffee case. See,

           e.g., 89th Ill. Gen. Assem., House Proceedings, February 16,

           1995, at 79, 89-90, 117-18. As one author has noted, the facts

           of this case were presented to the public in a skewed fashion.

           M. Rustad, Nationalizing Tort Law: The Republican Attack on

           Women, Blue Collar Workers and Consumers, 48 Rutgers L.

           Rev. 673, 720-21 (1996). In that case, it was reported that an

           81-year-old woman received a $2.9 million punitive damages

           verdict for injures incurred after she spilled hot coffee in her

           lap. However, less widely reported was that the verdict was

           reduced by the court to $480,000, the elderly woman underwent

           numerous skin graft operations for third degree burns, and

           McDonald's had prior knowledge of hundreds of similar

           scalding incidents. 48 Rutgers L. Rev. at 719 n.228. Also, the

           excessive award was for punitive, not compensatory, damages.

           

           

           [fn2] In Bernier, this court declined to apply a standard stricter

           than rationality review to medical malpractice legislation. This

           court rejected the intermediate test employed by the Supreme

           Court of New Hampshire in Carson v. Maurer, 120 N.H. 925,

           424 A. 2d 825 (1980) and by the Supreme Court of North

           Dakota in Arneson v. Olson, 270 N.W.2d 125 (N.D. 1978). We

           adhere to the Bernier holding for purposes of evaluating section

           2--1115.1.

           

           [fn3] In Hall v. Gillins, 13 Ill. 2d 26 (1958), this court upheld

           as constitutional a cap on damages obtainable under the

           Wrongful Death Act because the legislature created both the

           right and the remedy. As such, this court held that the

           legislature's right to limit the maximum recovery could not be

           questioned. Hall, 13 Ill. 2d at 29. Likewise, in Cunningham v.

           Brown, 22 Ill. 2d 23 (1961), this court held that the damages

           cap contained in the Dramshop Act of 1872 passed

           constitutional muster because the cause of action was a creature

           of statute; i.e., no common law cause of action existed against

           a supplier of alcohol.

           

           [fn4] In Bernier, this court held that the elimination of punitive

           damages in medical malpractice cases served the legitimate

           legislative goal of reducing damages against the medical

           profession. In doing so, the court expressly stated: "That this

           court previously has invalidated, as special legislation, limits on

           recovery of compensatory damages in medical malpractice

           actions [citation], does not require that punitive damages be

           available in every case. The two are readily distinguishable;

           punitive damages, as their name suggests, are intended to punish

           rather than compensate." Bernier, 113 Ill. 2d at 246.

           

           [fn5] "Fault" is defined in section 2--1116 as "any act or

           omission that (i) is negligent, willful and wanton, or reckless, is

           a breach of an express or implied warranty, gives rise to strict

           liability in tort, or gives rise to liability under the provisions of

           any State statute, rule, or local ordinance and (ii) is a proximate

           cause of death, bodily injury to person, or physical damage to

           property for which recovery is sought." 735 ILCS 5/2--1116(b)

           (West 1996). "Contributory fault" is any fault which may be

           attributed to the plaintiff. 735 ILCS 5/2--1116(b) (West 1996).

           For purposes of our discussion regarding the apportionment of

           liability under section 3.5(a), we adhere to these definitions of

           fault and contributory fault. But see R. Wright, Allocating

           Liability Among Multiple Responsible Causes: A Principled

           Defense of Joint and Several Liability for Actual Harm and Risk

           Exposure, 21 U.C. Davis L. Rev. 1141, 1143-46 (1988) (arguing

           that the appropriate terminology to use when discussing the

           apportionment of liability is "comparative responsibility"); see

           also L. Pressler & K. Schieffer, Joint and Several Liability: A

           Case for Reform, 64 Denv. U.L. Rev. 650, 665 n.79 (1988).

           

           [fn6] In the circuit court, defendants contended that the section

           3.5(a) credit could be saved by construing it so that "multiple

           tortfeasors [would receive] a cumulative total credit for the

           employer's liability assessment." See also S. Miller,

           Contribution Claims Under the New Act, 6 IDC Quarterly ii, iv

           (First Quarter 1996) (suggesting that the section 3.5(a) be

           construed so that "the employer's share of fault [is] deducted

           from the total damages rather than from each individual's

           share"). However, the tortfeasors already receive a "cumulative

           total credit for the employer's liability" under section 2--1117.

           Thus, this argument does nothing to eliminate the double

           reduction which occurs when the section 3.5(a) credit is given

           effect.

           

           [fn7] The proponents of the amended version of section 2--1117

           have uniformly asserted that, under the doctrine of joint and

           several liability, tortfeasors are held liable for damages which

           they do not cause. See, e.g., 89th Ill. Gen. Assem., House

           Proceedings, February 16, 1995, at 17 (statements of

           Representative Cross) ("[Section 2--1117] would abolish the

           doctrine of joint and several liability to hold people who are

           responsible for other's damages responsible for only their share

           of the losses and not for the losses which they did not cause");

           K. Dillard, Illinois' Landmark Tort Reform: The Sponsor's

           Policy Explanation, 27 Loy. U. Chi. L.J. 805, 813 (1996)

           ("[T]he system [of joint and several liability] unfairly forced

           defendants to pay more than the damages which they caused");

           M. Redish, The Constitutionality of Illinois Tort Reform III--The

           Repeal of Joint and Several Liability, IDC Quarterly, at 5, 10

           (Second Quarter 1996) ("In repealing joint-and-several liability,

           the General Assembly decided that fundamental notions of

           morality dictate the conclusion that defendants should not be

           obligated to pay for harm which they did not cause"); S. O'Neil,

           A New Day, The Civil Justice Reform Amendments of 1995, 9

           CBA Rec. 18, 20 (May 1995) ("Although it may seem unjust to

           leave a plaintiff uncompensated for the entire loss, it may be

           equally unfair to require a defendant who caused a small portion

           of those damages to pay them in their entirety").

           

           [fn8] Before the circuit court, defendants contended that the

           "only" means by which the legislature could give effect to this

           policy was to adopt proportionate several liability.

           

           [fn9] These requirements are expressly incorporated into several

           other amendments to the Code of Civil Procedure as well:

           section 8--802 (privilege between healthcare practitioner and

           patient), section 8--2001 (inspection of hospital records), section

           8--2003 (physician's and other healthcare practitioner's records)

           and section 8--2004 (records of clinical psychologists and

           clinical social workers). 735 ILCS 5/2--1003, 8--802, 8--2001,

           8--2003, 8--2004 (West Supp. 1995). Because the challenged

           medical disclosure requirements originate in section 2--1003(a),

           our discussion hereafter will focus on that section. 

           

           [fn10] We note that the legislative debate provides little insight

           into whether the sponsors of Public Act 89--7 intended that the

           circuit courts would retain their discretion to enter protective

           orders and to impose sanctions other than the dismissal specified

           in section 2--1003(a).

           

           [fn11] Because plaintiffs do not base their claim on a federal

           right to privacy, we do not discuss any federal cases involving

           privacy interests. 

           

           [fn12] The Hippocratic Oath, according to the Judicial Council

           of the AMA, was conceived during the fifth century B.C. and

           stands as the oldest statement of ethics governing the medical

           profession. It requires the oath taker to keep secret confidential

           matters relating to patients. Similarly, the AMA's principles of

           medical ethics and the opinions of the Judicial Council of the

           AMA emphasize duties of honesty and confidentiality to the

           patient and preservation of the patient's confidential information.

           Additionally, the prior express consent of the patient to

           disclosure of confidential information is considered a right of

           the patient. See Petrillo, 148 Ill. App. 3d at 590.

           

           [fn13] We do not, however, create a broad-based remedy for

           perceived violations of a person's privacy interests by private

           parties. Instead, we focus narrowly on the constitutional source

           of the privacy interest that can be deemed a part of the public

           policy of this state.